## Case No. 13,331.

### STEAM CUTTER CO. v. SHELDON et al.

[10 Blatchf. 1; 5 Fish. Pat. Cas. 477.] [1]

Circuit Court, D. Vermont. March 25, 1872.

PATENTS—LICENSE—RIGHT TO MANUFACTURE AND USE — REPAIRS — TERM OF PATENT — INFRINGEMENT—DAMAGES—PROFITS —ABANDONMENT—INJUNCTION.

1. W., the patentee of a machine for quarrying stone, assigned his patent to C. Before that, W. had made a written agreement with S., transferring to S., and his assigns, "the right to use the patented invention, to the extent of one machine," in the quarry of S., "and in no other place," to the full end of the term of the patent, and further agreeing, that S. should have the privilege of using additional machines, in such quarry, and not elsewhere, on making certain specified gross payments to W. The agreement further provided, that W. should superintend the construction of at least one machine, and be compensated therefor by. S., for days' labor, S. to pay for constructing the machine. One machine was built, and paid for by S., and put to work in the quarry of S. S. used it for a time and then ceased, for more than two years, to use it, but, during the interval, repaired it. During the same interval, it was used by R., in a different quarry, with the knowledge of S. Afterwards, S. put into use, in his quarry, five machines got up by one L. C. notified S. that the machines of L. infringed the patent of W. S. had taken from L. an agreement by L. to defend the machines of L. against claims under the patent of W. S., after this suit was brought, tendered to C. and to W. money, as and for the payment for the right to use five additional machines, under the agreement with W. Held, that S. acquired, by the agreement with W., the right to manufacture, as well as the right to use, the machines mentioned in it, subject to its conditions.

[Cited in Steam Stone Cutter Co. v. Shortsleeves, Case No. 13,334; Porter Needle Co. v. National Needle Co., 17 Fed. 538.]

2. S. acquired the right to repair and rebuild the one machine, so as to have and keep in use one machine, in his quarry, during the life of the patent.

[Cited in Wooster v. Sidenberg, Case No. 18,039.]

3. S. was liable for the profits from the use of the one machine by R., and for the damages thereby sustained by C.

4. S. did not forfeit his rights in respect to the one machine, by allowing it to be used by R., in another quarry.

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and Samuel S. Fisher, Esq., and here compiled and reprinted by permission.]

5. S. was a naked infringer in using the five machines of L., and could not defeat the right of C. to recover in this suit, in respect of such use, by the tender above mentioned.

6. S. had abandoned and forfeited all right, under the agreement with W., in respect of any additional machines, beyond the one machine.

7. S. must be enjoined from using any but the one machine first put into use, and be decreed to pay all profits made by him by the use of the five machines, or by the use of the one machine by R., and all damages sustained by C. from both of such users.

[This was a bill in equity by the Steam Stone Cutter Company against Charles Sheldon and others for the infringement of letters patent No. 40,584, granted to G. J. Wardwell, November 10, 1863; reissued October 10, 1865, Nos. 2,087 and 2,088.]

[Final hearing on pleadings and proofs.]

Chauncey Smith and John Prout, for plaintiffs.

Edward J. Phelps and James N. Edminster, for defendants.

WOODRUFF, Circuit Judge. This is a suit in equity brought to restrain the defendants from infringing certain patents, for a stone channelling machine, and machinery for cutting and quarrying stone and marble, issued to George J. Wardwell, patentee, and reissues granted to the complainants, his assignees, and praying for a discovery and an account of the gains and profits accrued to the defendants from alleged past infringements, and for damages. Although the answer of the defendants put in issue the novelty of the alleged inventions and the exclusive title of the complainants, and denied that the alleged infringing machines used by them (which were made by the Windsor Manufacturing Company, and were called Lamson machines) were a violation of the rights of the complainants, and some testimony was comprised in the proofs, bearing on those questions, neither of these denials was insisted upon when the cause was brought to a hearing. The decision of this court in Steam Cutter Co. v. Windsor Manuf'g Co. [Case No. 13,332], which affirmed the validity of the patents, and that the like machines were infringements, was accepted by the defendants' counsel, and the defence was rested solely on the agreement made by the defendants, on the 1st of June, 1864, with the patentee, Wardwell, to be presently mentioned, and the acts and rights of the defendants under that agreement.

This agreement was made before the assignment by Wardwell to the complainants, and it recited, that Wardwell had obtained letters patent for certain improvements in machines for cutting stone, and that Sheldons & Slason were desirous of obtaining an interest therein; and the agreement witnessed, that, in consideration of one thousand dollars paid by the defendants, the said Wardwell assigned, transferred, and set over

to the said Sheldons & Slason, their heirs, executors and assigns, "the right to use the said patented invention, to the extent of one machine, in their quarries at West Rutland, and in no other place or places, * * * the same to be had and held by the said Sheldons & Slason, for their use and behoof and for the use and behoof of their heirs, executors and assigns, to the full end of the term for which said letters patent are or may be granted." Wardwell further agreed, that the said Sheldons & Slason, their heirs, &c., should have the privilege of using all improvements that he might add to said patented machine, the same to be applied and used on the said machine, in their quarries at West Rutland, and in no other place or places. The instrument then provided: "And I further agree to and with the said Sheldons & Slason, their heirs, executors and assigns, that they shall have the privilege of using additional machines, upon the conditions hereinafter mentioned, to wit, one additional machine upon the payment of two hundred and fifty dollars, a second additional machine upon the payment of two hundred dollars, a third additional machine upon the payment of one hundred and fifty dollars, a fourth additional machine upon the payment of one hundred dollars, a fifth additional machine upon the payment of fifty dollars, and, upon the further payment of fifty dollars, any number of machines more than six; all of the above machines to be used on the quarry property now owned by the said Sheldons & Slason, at said West Rutland, and in no other place or places. I further agree to and with the said Sheldons & Slason, their heirs, executors and assigns, that they shall have the privilege of using, on the above-named machines, all the improvements that I, George J. Wardwell, may add to said patented machine." Immediately before the execution of the foregoing, and in pursuance of the negotiation which followed the perusal thereof by the defendants, and at their instance and requirement, the following supplemental agreement was prepared, and the two were simultaneously delivered, that is to say: "Whereas, I have this day sold Sheldons & Slason the right to use machines for cutting stone upon their quarries, now opened or hereafter to be opened upon their quarry property in West Rutland—for full explanation, see sale of right, as executed this day—and it is further understood, that I am to superintend the construction of at least one of the machines, in the best manner and in the cheapest possible way, the said Sheldons & Slason to pay for construction of same. I further agree to attend to starting of the machine upon their north quarry, so called, superintending the same until fairly and successfully at work, S. & S. to pay my board while attending to the same, and, also, a fair compensation per day, for each day's labor." The one thousand dollars stipulated in the agreement was paid by

the defendants, and, immediately thereafter, Wardwell recommended the procurement of the first machine at a machine shop in St. Johnsbury, with the proprietors of which he had previously had some negotiations in relation to the construction of machines, and a stipulation as to the terms on which they would build them. A machine was there built, the bill therefor was rendered by the machinist to Wardwell, the bill was paid by the defendants, and the machine was put in operation at the defendants' quarry in the fall of 1864 or the spring of 1865, the defendants, through Wardwell, procuring from Boston an engine wherewith to operate the machine. It was used for a short time, in cutting one cut or channel of about forty feet in length, and was then removed by the defendants, under a conviction, that, in that quarry, it could not be used to advantage, and it was not again used by them until the summer or fall of 1867, but repairs were made, and some new parts were substituted for old. During the year 1866, or in that year and early in 1867, as appeared in evidence, this machine was used, in a neighboring quarry, by the Rutland Marble Company, but, except by the fact of such use, and that the firm was aware of that fact, it did not appear that it was by the consent of the defendants, nor did it appear that they received any compensation therefor. Meantime, Ebenezer G. Lamson, (claiming to be the inventor,) and the Windsor Manufacturing Company, had begun, and were carrying on, the manufacture of the infringing machines, called, in the litigation, the Lamson machines, and, in the summer or fall of 1867, and thereafter, the defendants purchased, and put in operation, in their quarries, five of such machines. They were, at or about the same time, notified, on behalf of the complainants, that such machines were infringements of the Wardwell patents. They were forbidden to use them, and were apprised that the complainants would institute legal proceedings, to restrain any wilful and persistent violation of their rights under the said patents, and to recover damages therefor. To meet the exigency thus suggested, the defendants had already fortified themselves, by taking from the said Lamson and the Windsor Manufacturing Company, contemporaneously with their purchase, a special agreement, by which the parties last named agreed to defend the machine and apparatus sold by them, and fully protect the said Sheldons & Slason in the use and enjoyment of all so by them purchased, and, in case of any litigation involving the said Sheldons & Slason for such use, to assume the litigation, and pay all damages and costs to which Sheldons & Slason might be subjected, and save them whole and harmless, and, in case of final adjudication against the right, then to take back the machines and rights granted, and repay the consideration, or so much thereof as should be just, equitable and sufficient to make them

whole in the premises. Thus fortified, the defendants, disregarding the notice from the complainants, persisted in the use of the Lamson machines. The complainants prosecuted their suit against Lamson and the Windsor Manufacturing Company, and, in November, 1870, commenced this suit against the defendants. Before putting in their answer, the defendants, having heard of the decision in the suit against their vendors, on the 9th of December 1870, tendered, unconditionally, to the complainants, and also to the said Wardwell, the sum of nine hundred dollars, "on account of their contract with the said Wardwell," which tender is set up, in the answer, as covering the amount which, by the terms of the agreement above stated, the defendants were to pay to entitle them to the use of five additional machines, and, also, interest thereon from the time such use was begun.

Upon these facts, the claims of the parties arise, which were urged on the hearing. If there are any others which seem to us material, they will be adverted to in disposing of the case. The complainants insist, that the agreement between Wardwell and the defendants conferred upon the latter only the right to use the Wardwell machine and the improvements he might make thereon; that such right to use was separate and distinct from the right to construct the machine for the purpose of use, and the agreement did not include the latter; that the defendants, therefore, could not procure machines (even though they had paid the money mentioned in the agreement) except from the patentee, or his assigns, or from some person authorized by him or them to construct machines; that the payment of the sums specified was a condition precedent to the right of the defendants to use any other than the first machine, which was manufactured under the superintendence of Wardwell; that the defendants, having paid for that first machine, had the right to use that, but had no right themselves to repair it, or to rebuild it by substituting new parts thereof; that, hence, in respect of the five machines purchased from the Windsor Manufacturing Company, the defendants are liable as tort-feasors, infringing the rights of the complainants, on two grounds—first, that they had no right to make, or procure to be made, any machines, except by the complainants, or by their consent or license—and, second, that, they not having performed the condition precedent, by the payment of the sums stipulated, they had no right to use the additional machines, by whomsoever made; that, in respect of the first machine, they are now infringers, because, first, they have repaired and partially rebuilt it, and, second, they have suffered it to be used outside of their quarry, and have so forfeited the license conferred by the agreement; and, finally, that the conduct of the defendants, as shown by the evidence, establishes an abandonment of the agreement,

and a forfeiture of all rights under it, in such wise, that it constitutes no defence to this suit, and the defendants could not, by the tender which they made, reinstate themselves in the position they once held under the agreement. The defendants maintain the contrary of most of these propositions, and insist, that the agreement gave them the right to make, or cause to be made, any machines, when or where they saw fit; that it gave them the right to repair, and, if necessary, rebuild, the machine which was constructed under the superintendence of Wardwell, and first put in use; that, although the agreement imported that, before such making and use of the additional machines, they should pay the sums specified therefor, a court of equity should not regard them as having forfeited their right, and subject them to accountability as tort-feasors, but, on payment of the amount stipulated, as already tendered, with the interest from the time when it ought to have been paid, should regard them as having made the complainants whole in the matter, and as, therefore, exonerated from further liability; that the use of the one machine, by the Rutland Marble Company, though not warranted by the terms of the agreement, was not the act of the defendants; that, although the marble company may be liable therefor, the defendants are not; and, especially, that such use could not operate to destroy the right of the defendants to use that machine or the others.

Our conclusions upon the case are as follows:

1. We think it clear, that the right conferred upon the defendants, subject to the conditions of the agreement, was a right to construct and use the machines therein mentioned. True, the patent granted to an inventor confers upon him the right to make, to use, and to vend to others to be used; and it is possible for him, in granting to others a share in his exclusive right, to limit the privilege granted, as he may see fit, and it is, therefore, possible for him to keep these privileges distinct, if he can find persons willing to pay for one without the right to enjoy either of the others. Each case, however, must be judged of as well by the terms of the grant of privilege, as, also, by the situation of the parties or the circumstances under which they act. Wilson v. Stolley [Case No. 17,839]. If a party engaged exclusively in the construction of machines of various kinds, for sale to others, were to receive a license to manufacture a patented machine, for a consideration presently paid to the patentee, a construction which would deny him all opportunity to make the privilege of any value, forbidding his sale of the machines when manufactured, should be very clearly imported by the license, or the court would hold that the parties meant that he should derive some benefit from the license, and not be left thereafter wholly dependent on the will of the patentee. On the other hand, when the patentee, having made machines, sells one with the right to use the same, his grant may, with propriety, be limited to the particular machine sold; and it is, also, clear, that such a sale would (unless limited in terms, or by special circumstances) import the right to use, although not so expressed. So, a sale of a patented invention to a dealer, not for use, but for sale to others, would carry with it the right, in the ultimate purchaser, to use the machine sold. Limitations in respect to territorial limits, extent of use, and the like, may be, and, in general are, provided by express terms or stipulations.

In the present case, it appears, by the evidence, that Wardwell, the patentee, was struggling with a comparatively untried invention, anxious to bring it into use. The defendants were proprietors of quarries, engaged largely in business, and their example and their recommendation would be of great service in bringing his expensive machine before the public, and, if it proved valuable, into reputation. To secure this advantage, Wardwell, reciting that the defendants were desious of "obtaining an interest" in his letters patent, in consideration of one thousand dollars paid by them, assigned and sold to them, and their heirs, executors and assigns, the right to use "said patented invention," to the extent of one machine. Were there nothing more in the agreement or its contemporaneous supplement, we should say, that these terms imported a grant of the right to the whole benefit of what was secured to Wardwell by the patent, to the extent of one machine. Subsequent words limited the use to their quarries. But, within those quarries, they could, to that extent, use the invention, and, to be used within those quarries, they could sell and assign it, or vend it to others to be used. The defendants did not suppose —Wardwell could not have supposed—that he still retained a control over the interest which the defendants sought to acquire, which would render it necessary for the defendants to pay him further for one of the privileges secured to him by the letters patent, before they could make their purchase available for any purpose. They both supposed that this transaction was the direct and immediate means of bringing his invention into important use. The letter of the defendants, written shortly afterwards, at the request of Col. Nichols, who was in some manner interested in the patent, wherein they say: "We have had one machine made, and paid one thousand dollars for the right to use it, and intend to get other machines as fast as we can," indicates this construction of the agreement, most clearly. But, the supplemental agreement makes this quite plain. In that, Wardwell, at the instance of the defendants, as is obvious from the tenor of the agreement itself, and as is expressly proved, in order to enable Sheldons & Slason to procure the one machine, agreed to superintend its construction and attend to starting it, superintending

the same until fairly and successfully at work, they paying for its construction, paying his board, and a fair compensation, per day, for each day's labor. If it were otherwise doubtful, it is plain, that, under this agreement, the defendants could have required him to superintend that construction on their own premises, by their own machinist, or at any other machine-shop which they might designate. He was to be paid no further royalty or license fee, nothing for any supposed exclusive right to manufacture, but only for his days' labor, as a mechanic. His skill was put at their service, for the construction of the machine in the best manner, and at the smallest cost, and that alone the defendants were to pay. We think, therefore, the claim that the defendants did not acquire the right, (subject to the other conditions of the contract,) to make the machines themselves, or employ others to make them, is not well founded. All that has been said applies as well to the additional machines, except that the defendants did not bind Wardwell to superintend their construction. The gradually diminishing scale of prices for the privileges granted, adopted to induce the defendants to bring the machines into large use, tends in the same direction as other circumstances above adverted to.

If it were necessary, we might, on the authority of Woodworth v. Cook [Case No. 18,- 011], and cases therein cited, go further, and say, that it is established, by other proofs, to our satisfaction, that it was the intention of the parties that the defendants should have the right to make, or procure to be made, the machines which they obtained the right to use, and that, if this does not sufficiently appear by the language of the instruments, then the omission in this respect was a plain mistake. The instrument does not, in that case, express the actual agreement; and, although no cross bill has been filed, to reform the contract, such facts may be used as a defence to the suit; and, as it is shown that Wardwell is not only a stockholder, but one of the trustees of the complainants, and their superintendent of construction, it is not clear that the complainants can assert that they are bona fide purchasers, without notice of the agreement with the defendants, who were already in the possession and use of one of the machines, so as to deprive the defendants of such defence. But, our conclusion, founded upon the considerations before stated, renders it unnecessary to place the decision upon this ground.

2. We think it no less clear, that the agreement conferred the right to repair, and, if necessary, to rebuild, the first machine, made, paid for and put to use in the quarry. The grant was not a sale of a particular machine, or a license to use a particular machine, but, it was an assignment of the right to use the patented invention, to the extent of one machine; and this right was "to be held and enjoyed by the defendants, their heirs, executors and assigns, to the full end of the term of the patent." During all that time they might have and keep in use one machine. Number of machines in use was the subject of limitation, but it was to be permitted for the full term. Extent of use was the subject of declaration defined by the agreement, but that extent of use was to continue through the period. Whatever was necessary to the enjoyment of that use, to the extent or limit of one machine during the whole period, was involved in the grant. If repairs were necessary, that was included, if rebuilding was requisite, that might be done, so that the use stipulated for and granted might extend through the duration of the patent. See Bicknell v. Todd [Case No. 1,- 389]; Woodworth v. Curtis [Id. 18,013].

These views in regard to the construction and effect of the agreement are important in reference to the relief to be granted, notwithstanding our opinion upon other branches of the case. The defendants, by the agreement, and the payment to Wardwell of the one thousand dollars therein mentioned, did acquire the right to construct and use the machine which, under the superintendence of Wardwell, was made, and, also, the right to keep it in repair, and, if necessary to the enjoyment of the use of the patented invention, to the extent of one machine during the term of the patent, to rebuild it, maintaining it in suitable condition for use. We find no ground for saying that these rights have been forfeited. In so far as the use of this machine in another quarry was beyond the license, we think the defendants are liable for any profits they realized therefrom, and for any damages sustained by the complainants. The defendants are not shown, it is true, to have given an actual consent to such use, but they had the ownership and control of the machine, and there existed no right to use it outside of their quarry. They acquiesced in such use. Without their consent, or that of their agents, such use could not have happened. There is no pretence that the Rutland Marble Company took the machine by force or against the will of the defendants. In that infringement of the rights of the complainants, the defendants find no protection in the agreement. They are, with the Rutland Marble Company, joint infringers. But, the present grant cannot, in respect to such machine, be regarded as upon condition. It is enough, that, for such unlawful use, the agreement furnishes no protection. As to that, the defendants stand liable, as they would be if aiding, or co-operating with, the Rutland Marble Company, when no such agreement was in existence. In respect to that machine, the property is vested, the agreement is fully executed, and the right is not revocable. There was no condition annexed, upon the breach of which the complainants were remitted to their original rights, and could treat the agreement as at an end. They limited the privilege granted, and any use beyond

that leaves the defendants liable as infringers.

3. The much more important question relates to the effect of the agreement upon the right of the defendants to use the five machines purchased from the Windsor Manufacturing Company. The defendants were not entitled to any right or privilege beyond the use of one machine, except upon conditions expressly stated in the agreement. Without compliance with those conditions, they stood, in their relation to the patentee, in the same position as a third party having no agreement with him, and their use of his invention was as clear an infringement of his patent as like use by such third party. In respect to additional machines, they had, perhaps, secured an option, at a low rate of charge by the patentee, but, the condition that they should pay the sums named was none the less absolute. It was upon the payment, and only upon the payment, that they were entitled to use any additional machine. They, therefore, bought and used the Lamson machines without right, and as literally and truly so, as if they had never had an agreement with Wardwell. The right of the complainants to treat them as tort-feasors was perfect. They were liable to the complainants for damages, and the complainants' title, in equity, to treat the gains and profits realized by such tortious use, as held by the defendants as trustees for the complainants, was fixed and certain, and, on filing the bill of complaint herein, the right to recover could not, in any aspect of the case, be defeated by a tender of performance of the original conditions. This is not upon the ground of any forfeiture, not because any right once acquired was forfeited by the non-performance of a condition, but because the right to use the additional machines never existed. It was not acquired by the defendants in the only mode in which they could gain it. The complainants, therefore, could not, upon any principle of law or equity, be compelled to waive their right to gains and profits, and accept interest on the money, in lieu thereof.

But, this is not all. The defendants, by their conduct, placed themselves in such a position, as, we think, both at law and in equity, deprives them of any benefit whatever from the agreement, so far as relates to the additional machines. Quoad hoc, defeated the very design and purpose which, upon their own showing, and as, in reference to the other branch of the subject, they here claim, constituted the inducement which moved the patentee to make the arrangement. They discontinued the use of the patented machine, which they had a right to do, but the doing of which points to their design and purpose to abandon the contract. They lay by for three years, doing nothing in the use of the invention, suffered the machine which they had to be used by the Rutland Marble Company, as a thing in which they had no concern, and then allied themselves to the infringers of the patent, and bargained for infringing machines. When notified, by the complainants, that such machines were a violation of their rights under the patent, and that prosecution would follow, they not only made no pretence that they were acting, or were willing to act, under the contract, but set the complainants at defiance, secured themselves against loss, by the covenants of the infringers, and persisted in the piracy. Instead of acting in subordination to the contract, with a view to preserve the rights or advantages stipulated therein in their favor, they lent themselves, so far as in their power, to the destruction of all value in the thing stipulated. Instead of exercising the option which, it may be conceded, they had, for a reasonable time, at least, to take and use the machines specified therein, they declared, by the most decided and unequivocal conduct, their intention to pay nothing more for machines or the right to use them, to Wardwell or to the complainants. Had they so declared in the strongest terms language can furnish, they could not more distinctly have expressed their determination to have, or pay for, no more Wardwell machines. In this view, the defendants must be deemed to have abandoned the contract, so far as it related to additional machines, and the complainants had a clear right, in equity not less than at law, to accept the abandonment and hold them to its consequences. This is no hardship. It partakes very little of the character of the enforcement of a forfeiture. The defendants chose, voluntarily, to attach themselves to the infringing party, and, when they did so, they chose to meet the just consequences. If they were advised that the machines which they used were not an infringement, that only establishes more firmly that they abandoned their contract with Wardwell and determined to have no more of his machines, and shows more fully, that, in the face of admonition and warning, they preferred to take their chance with the infringers. When, after about six years, their effort to defeat the purposes of the agreement had had its probable effect, to the prejudice of the complainants, and the decision of the question of infringement had shown that their conduct was unlawful, it was too late to retrace their steps. Their conduct had discharged the complainants and Wardwell from any obligation to treat them as licensees in respect to any machine but the one originally put into use. The conclusion is, that the complainants are entitled to a decree, that the defendants be enjoined from using the five machines purchased from the Windsor Manufacturing Company, or any machine but the one first put into use, but not against repairing and maintaining that machine during the term of the patent, for which the complainants or their assignor have received the full consideration. The defendants must, also, be decreed to account for, and pay to the complainants, all gains and profits made

by them, by the use of the said five machines, or by the use of the other one by the Rutland Marble Company, and must be decreed to pay, in addition thereto, all damages, (beyond such gains and profits,) if any, sustained by the complainants, from the defendants' unlawful use of the said five machines, or from such unwarranted use of the said first machine by the Rutland Marble Company, together with the costs of this suit.

[For other cases involving this patent, see Steam Stone Cutter Co. v. Shortsleeves, Case No. 13,334; Same v. Windsor Manuf'g Co., Id. 13,335; Same v. Windsor Manuf'g Co., Id. 13,336.]