WITHINGTON–COOLEY MANUF'G CO. v. KINNEY.

(Circuit Court of Appeals, Sixth Circuit. June 4, 1895.)

No. 270.

PATENTS—LICENSE BY IMPLICATION—INVENTION BY EMPLOYE.

An inventor was employed at a salary by a manufacturer of machines to devise a new and improved machine and superintend the making of patterns therefor, with full knowledge that his employer intended to construct the machines for sale. A successful machine was accordingly made. Soon afterwards the inventor left the employment and obtained a patent, but the manufacturer continued to make and sell the machines. The original patterns were subsequently destroyed by fire, but new ones were made and the construction of the machines continued. The inventor claimed a royalty, but the manufacturer refused to pay it, on the ground that he was entitled to make the machines. After the expiration of 10 years, an infringement suit was brought against users of the machine who bought it of the manufacturer. *Held* that, under the circumstances, there was an implied license to the manufacturer to make and sell the machines, and that the same was not terminated by the destruction of the original patterns.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This was a bill by Horace B. Kinney against the Withington-Cooley Manufacturing Company for infringement of a patent for an improvement in power presses. There was a decree for complainant in the court below, and the defendant appeals.

Edwin H. Risley, for appellant.

A. H. Swarthout, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge. The complainant in the court below, Horace B. Kinney, is the inventor and sole owner of patent No. 264,837, which was issued September 19, 1882, for an improvement in power presses used in the manufacture of hoes and forks. The de-

fendant below was the Withington-Cooley Manufacturing Company, a corporation of the state of Michigan. The object of the bill was to enjoin and restrain the defendant company from using two power presses which complainant alleges infringe the improvement covered by his patent. Upon a final hearing there was a decree in favor of the complainant, sustaining the validity of his patent, adjudging the defendant to have infringed, and enjoining it from making, selling, or using power presses embodying the invention described and claimed in letters patent No. 264,837. There was also a judgment against the defendant for nominal damages and costs, an accounting being waived by complainant.

The validity of Kinney's patent has not been seriously questioned. Neither can there be any serious doubt on this record that the power presses used by the appellant do infringe the complainant's patent. The only substantial defense urged by the appellant is that the presses used by it were made by one Henry D. Babcock, and bought by it from Babcock, who claims to be a licensee under Kinney, having authority to make and sell presses embodying the invention secured under his letters patent. The controversy must therefore hinge upon the rights of Babcock as a licensee under Kinney. For some 12 years or more prior to the issuance of Kinney's patent, Babcock had been a manufacturer of machines used in the making of steel goods, especially of such machines as were used in making hoes and forks. His shops were at Leonardsville, N. Y. Kinney lived in a village near by, and was a practical machinist and a good mechanic. He had made some improvements in machines used in the fork and hoe manufacture, and had taken out a patent on a splitting and bending machine, which Babcock made, paying a royalty to Kinney on each machine as he sold it. Babcock was also the maker of a power press, made upon old principles and covered by no patent. The claim of appellant is that Kinney was employed for the express purpose of drawing plans and constructing patterns by which a new and improved power press might be made for the trade, with the clutch mechanism located in the slide or die holder in place of on the eccentric shaft, as in all the old forms of such presses. The appellee, on the other hand, insists that he was employed to make drawings and construct patterns by which an old form of press used by the Remington Agricultural Works, at Ilion, might be duplicated and sold to Babcock's customers in place of the old form of press made by Babcock, called a post press. He also claims that after he had made a rough sketch of this Ilion press, and had taken its measurements, he told Babcock that he had for a long time had an idea in his head, which it had not been convenient to work out before, by which a new press, acting more quickly and smoothly, might be made with the clutch mechanism shifted from the eccentric shaft to the slide sash, and that upon explanation Babcock directed him to prepare the drawings according to his new idea, with the understanding that if his plan was a failure he (Kinney) should bear the expenses of the experiment. While there is some evidence that Babcock was frequently consulted by Kinney during the preparation of the draw-

ings, making of the patterns, and in the experiments incidental to the perfecting of his improvements, yet there is no substantial conflict in regard to the fact that Kinney was the real inventor of the material improvements embodied in the patent subsequently issued to him. Neither is there any evidence of an agreement by which the employer should have any interest in any patentable improvement in power presses which Kinney might make during the period of his employment by Babcock. In the absence of evidence of such an agreement, it would seem that the title to the invention made by Kinney, or to any patent subsequently obtained by him, would be unaffected by the fact that he was in the service of Babcock, and in the use of his shop, materials, and of the service of his employés while devising and perfecting his invention. Hapgood v. Hewitt, 119 U. S. 226–233, 7 Sup. Ct. 193.

The conceded or established facts essential to a determination of the question as to whether Babcock is a licensee are substantially these: Babcock's business was that of making machines used by manufacturers of hoes and forks. He was not an inventor, and does not claim to be. Neither was he engaged in using these machines. What he wanted was such a power press as would meet the requirements of those engaged in using such machines, and enable him to satisfy what he had for some time recognized as a demand for a better press. The defect in the press of which he had patterns was in the fact that the upright presses known to him had the clutch mechanism, consisting of a pin or bolt for engaging the gear or collar, attached to the eccentric shaft. If a mechanism could be devised which could be attached to the sash or slide, which operated between two upright pieces, it was thought it would thereby do away with the stopping and starting of the eccentric shaft and pitman, and make a quicker-acting press. Babcock says that before his employment of Kinney to draw plans for a new form of press he had frequently spoken to him about the demand of the trade for a quicker press, and in their conversations a shifting of the clutch mechanism from the eccentric shaft to the slide or sash was suggested, discussed, and pronounced practicable. He does not say whether this suggestion was made by himself or Kinney, and we shall therefore assume it to have been made by the latter. The mechanism for the new clutch was not discussed, as he was not then ready to have new patterns made. In this condition of things, the Ashtabula Tool Company began negotiations with Kinney relating to some machines for use in their fork and hoe department, and a Mr. Tinker, in December, 1879, went to see Kinney about such machines, and with him examined the press in use at the Remington Works, at Ilion, New York. Such correspondence ensued between Kinney and Tinker as led to a proposal for prices upon a number of machines used in hoe and fork making, including a power press. Kinney had no shop, and was idle. He applied to Babcock for bids on the machines the Ashtabula Company wanted, hoping that there would be a margin of profit for himself. Kinney's statement concerning what occurred between himself and Babcock, when he applied to Babcock

for his prices for the machines desired by the Ashtabula Company, is that he told Babcock that his prices were so high, that he did not think he could make anything out of it, and that the Ashtabula Company was anxious that he (Babcock) should take the contract and that he (Kinney) should superintend the work. He also claims that he had made some improvements in the patterns for his patented machines which were in use at Ilion, and that he wanted the Ashtabula Company to have the benefit of his improved patterns as shown by the machines in use at Ilion. He then says that Babcock agreed that if the order was turned over to him he would have new patterns made from the Ilion machines, and employ him to superintend the structure. He further says, concerning a new power-press pattern, that Babcock said that, "if you think the Ilion press is a good press, the best press you know of, I will build patterns to that, and hold them for my own use as a press for the trade." "He said," says Kinney, "that he desired a better press than the one they were making; he thought he could sell some of them if he had it, and if I thought the Ilion press was as good as I had had any experience with, why he would be willing to make the patterns to that to fill this contract." Kinney insists that, in negotiating with the Ashtabula Company and with Babcock about their order, he had in mind nothing more than a duplication of the press at Ilion, and that nothing was then said as to any change in the location of the clutching device. One thing is made clear by this evidence, and that is that, before any order was made by the Ashtabula Company for any of Kinney's machines, or for a power press, he understood Babcock's anxiety for an improved power press, and he purposed abandoning the patterns then in use and owned by him, and have Kinney get up for him new drawings and new patterns, for use in making machines to be supplied to his (Babcock's) trade. As to whether these new drawings and patterns were to be a mere duplication of the old form of press in use by the Remington Works at Ilion, or were to embody a new plan for a quicker working press than any of the old forms known to the trade, there is a sharp conflict in the evidence. Upon this question, the weight of evidence is with the appellants. Babcock is very positive that before he received any order from the Ashtabula Company he had consulted Kinney in regard to a new press, one which would be a quicker-acting press. He says that they considered the practicability of shifting the clutch mechanism from the eccentric shaft, where it was located both in the Ilion press and the one which he had theretofore made.

The chief difference between the Ilion press and that which Babcock had theretofore made was that the former was an upright press standing on legs, while Babcock's press was called a post press, because it was hung to an upright post. Both were slow-running presses, due to the fact that the clutching device was attached to the eccentric shaft. The mechanism of a clutching device which could be attached to the slide or die-holder was not, says Babcock, discussed, but both agreed that if the mechanical difficulties could be overcome a quicker-acting press would result. Now,

ın view of the fact that Kinney, according to his own statement, had for a year or more such a scheme in mind, is it likely that he would wish to have the old, slow form of press built for his friends of the Ashtabula Company, or would he wish to have Babcock, who was paying him a royalty upon his machines used in association with a power press, build expensive new patterns which did not embody the improvement which he says he had in mind so long, and about which Babcock says they had consulted before any negotiation with the Ashtabula Company? The written order sent Babcock by the Ashtabula Company, in its description of the press desired, seems to clearly indicate that Kinney had conferred with its agent, Mr. Tinker, about his scheme for a new press, and that he intended to furnish them with a press which should not be either the post press of Babcock or the old form of press in use at Ilion. That company, under date of March 30, 1880, after stating that the writer was in receipt of a letter from Mr. Kinney "saying that he preferred to have me order the fork machinery that we have been writing about, and the same we talked over at Ilion the 25th, of you, and he agreeing to superintend the getting up of the same," proceeds with a description of the several machines needed, and thus describes the press ordered:

"One upright shanking press, standing on legs of the right height to be handy, with adjustable dies, with the same to round the back or head of the fork at the same time they are set down, with 3-inch lift or stroke, finished completely and ready to set, and belted up according to the plans described to me by Mr. H. B. Kinney, as he designed to have this new press."

Now, this description refers to a "new press," on designs by Kinney, and seems to us could not refer to a mere duplication of an old press which the writer had been shown in operation at Ilion. This view is confirmed by the evidence of Oscar F. Clark, an expert machinist and pattern maker, wholly disinterested. Clark, on receipt of this order, was employed especially to aid in making patterns for a new press, under Kinney's direction and from Kinney's drawings. Babcock, on receipt of this order, at once engaged Kinney and Clark to go to work on the patterns for the new press, and both were sent to Ilion by him to examine the Remington press. Kinney says the object of this visit was to make a sketch and measurements, so that it might be duplicated. Clark says that his understanding was that they were not to make a mere duplicate of the Ilion press, but were to get up a "new style of press," and that it was to get such points from the Ilion press as might be useful in the preparation of a new press that the visit was made. This view supports Babcock, and is supported by the terms of the Ashtabula Company's order. Kinney spent from four to six weeks in the preparation of the drawings, and in supervising the making of patterns for this new press embodying the improvements claimed in his patent. His work was done in Babcock's shop and with his materials, and he was assisted by Babcock and Clark and other employés in the service and pay of Babcock. He was paid journeyman's wages and board, according to an agreement made before

he began his work. He knew that Babcock was a machine maker and not a machine user, and that the object of Babcock in having these drawings made and patterns constructed was that he might make such presses and furnish them to those engaged in the fork and hoe manufacture. Kinney remained in Babcock's employment, and aided in the construction and shipment of the machine ordered by the Ashtabula Tool Company. When asked when he "became aware of the fact that Mr. Babcock was furnishing and marketing machines produced from the patterns made from your drawings?" he answered: "From the commencement. From the time that he shipped the first press; after that he kept right along making and. selling them." In July, 1880, he left Babcock's employment, and in November, 1881, applied for a patent covering the improvement shown in his drawings and patterns, which was granted September 19, 1882. Kinney claims that about a year after he quit Babcock's employment he notified him of his purpose to apply for a patent, and that he should require him to desist from making his machines unless he came to terms as to royalty. He says that after he got his patent he tried to come to a settlement, but that Babcock claimed that the improvement had been made at his expense, and that he had been advised that it rightfully belonged to him, and refused to make any proposition for a shop right or otherwise. This was in 1883. From that time until 1893 Kinney took no step to dispute Babcock's claim of right to make and sell these machines.

Upon this state of facts, we conclude that appellee must be presumed to have granted to Babcock a personal license to make and sell power presses embodying the improvements covered by his patent. In the early case of McClurg v. Kingsland, 1 How. 202, the facts were quite like those presented on this record. Harley was employed by the defendants in their foundry upon the weekly wages of a journeyman. While thus employed, he made an improvement in a molding process as the result of many experiments made at the expense of his employers. He continued in the same employment for several months thereafter, using his improved process in their business, though he often spoke of obtaining a patent, and proposed that the defendants should purchase his right, which they declined to do. After leaving their employment, he applied for and obtained a patent, which he assigned to the plaintiff, who brought suit for infringement. An instruction to the jury that, if they found the facts as we have substantially stated them to be true, they would justify the presumption of a license or special privilege to the defendants to use the invention in their business after he had left their employment, was approved on appeal. It is true that in that case Harley's wages were increased on account of his invention, but in Solomons v. U. S., 137 U. S. 342–348, 11 Sup. Ct. 88, where a like question was under consideration, the court approved and followed McClurg v. Kingsland, saying that, "There was one difference between that case and this, in that Harley's wages were increased on account of his invention; in this,

Clark's were not; but such difference does not seem vital." In the case last cited the rule deduced from McClurg v. Kingsland was thus stated:

"When one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employés to develop and put in practicable form his invention, and explicitly assents to the use by his employer of such invention, a jury or a court trying the facts is warranted in finding that he has so far recognized the obligations of service flowing from his employment, and the benefits resulting from his use of the property, and the assistance of the coemployés of his employer, as to have given to such employer an irrevocable license to use such invention."

In the late case of Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, the court refused to extend the doctrine of Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, to the facts of that case, and affirmed the rule of McClurg v. Kingsland and Solomons v. U. S. See, also, Rob. Pat. § 832, and cases cited.

There was some evidence tending to show that the original patterns made by Kinney were destroyed by fire before the machines sold appellant were made, and it has been insisted that the scope of the license should be limited by the life of the identical patterns made by Kinney. The duration and scope of a license must depend upon the nature of the invention and the circumstances out of which an implied license is presumed, and both must at last depend upon the intention of the parties. Rob. Pat. §§ 809, 810. The author last cited, at section 811 says:

"A license to make confers upon the licensee the right to construct the article which is described and claimed in the letters patent. If conferred alone, it gives the licensee no right to use or sell the article when constructed, and hence is generally coupled expressly with one or the other of these additional rights, as in licenses to make and use or to make and sell. Where the express words of the license embrace only the right to make, and the other rights are necessary to enable the licensee to derive any advantage from the license, the presumption that the licenser intended that the right conveyed should be beneficial to the licensee controls the interpretation of the license, and extends it to include the right to use or sell rather than permit it to be practically void. Thus a license to make the invention, conferred upon a licensee in whose business the thing made is ordinarily employed, carries by implication a right to use it when constructed. A similar license to a manufacturer of articles for sale, who has no use for this particular article when made, authorizes him to sell as well as make it. The scope of the license is governed by the same presumption. A license to make an article which is covered by several patents, all owned by the same licenser, is a license under each of these patents, to whatever extent the making of the invention may require."

In Montross v. Mabie, 30 Fed. 237, the court said:

"A license to a man engaged in business to make and sell a patented article in his business generally, unless there were something else to restrict it, would manifestly be coextensive with his business, and would continue until his business was wound up. The licensee in such a case is not restricted to manufacturing with his own hands, or selling by his own personal efforts only. He may employ as many hands and as many salesmen and agents as his business will admit. So long as the articles are made and are sold in his business, and for his use and benefit, the sale would be within the license, though effected by the hands of hundreds of different agents and employés."

See, also, Steam Cutter Co. v. Sheldon, 10 Blatchf. 1, Fed. Cas. No. 13,331.

The object of Babcock in employing Kinney, so far as that employment had relation to patterns for a power press, was to obtain patterns and drawings by which he, as a manufacturer of presses for the trade, might make and supply the trade with presses built on the new design and from the new patterns. This fact was well known to Kinney, and when he accepted employment and produced an improvement it must be presumed that he intended that his employer would use that improvement in such new machines as he should make while engaged in the business of supplying such machines to the trade. We cannot reasonably liken this case to the building of a machine for use. In such a case the license might well be limited to the use of the machine so long as its identity was preserved. But here Kinney was to make drawings at the expense of Babcock, and then patterns by which a working press might be made for sale and not for shop use. In McClurg v. Kingsland, heretofore cited, the invention was for an improved mode of casting chilled rollers. The nature of the invention was such as to imply a license for the continued use of the mode during the life of the patent by the licensee. In Solomons v. U. S., heretofore cited, the invention was for a self-canceling stamp, which stamps were made by the government for the use of revenue agents. The license implied was not limited to the stamps made while Clark, the inventor, continued in the government service, but was held to be a broad license to make and use the stamps.

We are of opinion that the license to be presumed, on the facts we have stated, was not limited by the mere life of the patterns, but was intended as an authority to make and sell power presses embodying Kinney's improvement so long as Babcock should continue in business, and during the life of the patent. The decree must be reversed, and the bill dismissed, with costs.