### WILSON v. AMERICAN CIRCULAR LOOM CO.

(Circuit Court of Appeals, First Circuit. May 29, 1911.)

No. 898.

1. REFERENCE (§ 99*)—REPORT OF AUDITOR—USE AS EVIDENCE.

Under the practice and decisions in Massachusetts, the report of an auditor appointed in an action at law is admissible in evidence on a trial of the case to a jury.

[Ed. Note.—For other cases, see Reference, Cent. Dig. §§ 148-156; Dec. Dig. § 99.*]

2. PATENTS (§§ 210, 218*)—IMPLIED LICENSE TO USE PATENTED ARTICLE—SHOP RIGHT—INVENTION BY EMPLOYÉ.

Plaintiff was employed by defendant as superintendent of its factory, in which it manufactured flexible tubing for covering electric wire, and it was a part of his duty to improve defendant's machinery. While so employed he made important improvements in machines for making such tubing; the entire cost of his experiments, the perfecting of his invention, the construction of a practicably operative machine, and the taking out of a patent therefor being paid by defendant, which also paid for the construction of machines which were installed in its factory under plaintiff's direction. During the time the machines were so used, plaintiff's salary was increased from $1,800 to $5,000 per year. *Held* that, on such facts, defendant had at least a shop right or implied license to use those particular machines without payment of compensation to plaintiff, and, in the absence of evidence warranting a finding of an agreement to pay therefor, an action to recover for such use was not maintainable.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 301, 302, 330-338; Dec. Dig. §§ 210, 218.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the Circuit Court of the United States for the District of Massachusetts.

Action at law by James S. Wilson against the American Circular Loom Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Sherman L. Whipple (Alexander Lincoln and Whipple, Sears & Ogden, on the brief), for plaintiff in error.

Moorfield Storey (Charles F. Perkins and Anson M. Lyman, on the brief), for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

COLT, Circuit Judge. This is an action of contract, in which the plaintiff seeks to recover compensation for the use of certain patented machines. The suit was originally brought in the Massachusetts state court, and removed to the United States Circuit Court.

The plaintiff was superintendent of defendant's factory, and while so employed invented an improvement in tubing machines covered by letters patent No. 543,587. He was also the owner of patent No. 690,355, relating to circular looms. During the time of his employment there were installed in the defendant's factory 25 of these tubing machines, and 2 of these circular looms.

The first two counts in the declaration allege that the plaintiff permitted the defendant to construct these tubing machines "upon the understanding and agreement that the defendant would pay the plaintiff a reasonable price for such use or shop right."

The third count in the declaration alleges that the defendant secured the permission to use the two loom machines "upon the understanding and arrangement that the plaintiff should receive therefor a reasonable sum for the use of said machines."

The court below sent the case to an auditor, and subsequently the case came on for hearing before a jury; Judge Lowell presiding. At the close of the plaintiff's evidence the court directed a verdict for the defendant, upon the ground that there was no sufficient evidence to warrant the jury in finding a verdict for the plaintiff. The case is before this court on the plaintiff's exceptions to this ruling of the court below, and also on exceptions to the admission of the auditor's report, and to the exclusion of certain evidence.

[1] In our view of this case as here presented, the evidence which was excluded was immaterial, and hence the exceptions to its admission call for no further consideration. With respect to the auditor's report, it was clearly admissible as evidence under the Massachusetts practice and the decisions of the state court. Lowe v. Pimental, 115 Mass. 44; Locke v. Bennett, 7 Cush. 445, 454; Holmes v. Turner's Falls Company, 150 Mass. 535, 23 N. E. 305, 6 L. R. A. 283.

[2] The important question now before the court is whether there was evidence sufficient to warrant the jury in finding that the defendant agreed to pay the plaintiff a reasonable compensation for the use or shop right in these machines.

The plaintiff does not contend that there was an express contract to pay for such use. He rests his case upon an implied contract; in other words, upon the proposition that there was evidence sufficient to warrant the jury in inferring a promise to pay for such use arising from the acts and conduct of the parties.

The material evidence may be summarized as follows: In 1892 the defendant was engaged in the manufacture of a flexible tubing or conduit designed to protect wires carrying electrical currents. From June, 1892, to August, 1904, the plaintiff was employed by the defendant as manufacturing superintendent of its factory. One of the duties of his employment was the improvement of defendant's machinery. In 1893 the defendant was using a machine for the manufacture of tubing which was not satisfactory. The plaintiff, among other things, undertook to perfect this machine, and early in 1894 he completed a machine, which was satisfactory. On June 7, 1894, he filed his application for a patent on this machine, and on September 30, 1895, a patent was issued to him. The defendant paid the entire cost of all the plaintiff's experiments in connection with this machine. In other words, the plaintiff used the materials furnished by the defendant, and the services of its employés, in developing and perfecting his invention and putting it into the form of an operative machine. The defendant also paid the entire cost of taking out the patent. During the time of the plaintiff's employment there were constructed under his direction, and at the defendant's expense, 25 of these tubing machines, which were installed in the defendant's factory. These machines proved of great advantage to the defendant's business. They were a distinct improvement on the prior machines used by the defendant. They decreased the cost of manufacture, and they materially increased the product. The consequence was that, owing largely to the plaintiff's invention, the business rapidly increased in volume and became very profitable. The plaintiff was first employed at a salary of $1,800 a year, and this was raised from time to time until it amounted to $5,000 a year. He was elected a director of the defendant company in April, 1898, and served until. August, 1904, when he failed of re-election. The defendant manufactured the Herrick flexible tubing covered by patent No. 456,271, under an exclusive license from the patentee. The plaintiff, in addition to his salary, had a direct interest in the profits of the business, since he was the owner of one-third of the Herrick patent, and the owners of the Herrick patent were entitled to receive one-third of the net profits which the defendant made on the sale of this tubing. The plaintiff was also a stockholder in the defendant corporation, and received the dividends upon his stock. The plaintiff was also allowed, in October, 1898, a commission of 1 per cent. on the gross sales of one of the products made by the defendant called electroduct, and in January, 1900, this was increased to 2½ per cent.

In 1892 A. T. Clark was treasurer of the defendant corporation, and H. H. Brooks was its general manager. Brooks died in 1899, and Clark then became its general manager, at the same time also

acting as treasurer. The evidence upon which the plaintiff bases his claim of an implied contract to pay a reasonable compensation for the use or shop right in these machines consists mainly of certain conversations which took place between the plaintiff, Brooks, and Clark.

The general character of the plaintiff's testimony concerning his conversations with Brooks and Clark is illustrated in the following extracts:

"Q. With which one did you have the first conversation? A. Mr. Brooks.

"Q. Where was that? A. On a train going to New York.

"Q. How long was that after you made your invention? A. Not a great while after.

"Q. Was it— I think the first machine was in January. The application is in January. Do you remember whether it was before you applied for the patent or not? A. I should say yes; I can't say positively.

"Q. Now, won't you state what that conversation was? A. I will. In going to New York the question of our commencing to make money was brought up, and I says: 'Bert, what would you do without the little machine?' We called it the little machine. He says: 'I guess we wouldn't be going over here in Pullman cars if it wasn't for the little machine.' I says: 'Bert, I ought to have something out of that machine.' He said: 'I think you had, Jim; but why don't you do as I have done and sell your patents to the company?' I said: 'I don't want to sell it. I may want to go into business myself.' "

"Q. Now, after that did you have any other or further conversations with Mr. Brooks before his death, on the subject-matter? A. Yes, sir.

"Q. Can you remember when or where they were? A. No."

"Q. Can you state in substance what they were, if they differed substantially from what you have stated? A. They didn't differ substantially from what I have just stated."

"Q. Now, after this talk with Mr. Brooks, did you have any talk or talks with Mr. Clark? A. Yes, sir.

"Q. On that same subject-matter? A. Yes, sir.

"Q. How soon would you say after you talked with Mr. Brooks did you have any talk with Mr. Clark on the subject-matter of compensation? A. Very shortly after. * * * I remember one instance of Mr. Clark going into the tubing room with me, showing him the machine. It was working very nicely, and I made the remark that without the machine we would not be able to make money. * * * He looked at the machine, and it was running splendidly, and remarked that with the use of such a machine that we could make large profits. And my side of the conversation, if I may say it, was that the saving in the tape alone over the old revolving mandrel would be a profit to us."

"Q. Yes; what did he say to that? A. Why, he agreed with me."

"Q. Now, did you have any talk with Mr. Clark at this time, or at any time, regarding the use of the machines by the company? A. I should say yes.

"Q. What was that talk? A. That they might use the machines in that particular business, but I had reserved the right to use them in anything else, and that it was a profitable machine, and I should expect to be paid for it.

"Q. What did he say to that? A. 'You ought to have something out of it.'

"Q. When was that? A. Why, it was in the early stages of the machine's perfection.

"Q. Early stages of its running? A. Yes, sir.

"Q. Did you have other conversations with him on that subject? A. Frequently."

The general character of Mr. Clark's testimony is illustrated in the following extract:

"Q. Now, how many times did he [Wilson] say just that or this in substance—now wait, and I will tell you—that the company had been using his inventions without giving him any compensation at all? How many times did he·say that, or that in substance? A. Several times. ·I don't remember just how many.

"Q. Twenty-five or thirty? A. Oh—

: "Q. Ten; a dozen? A. I couldn't give you any number.

"Q. Did you ever deny it in any talk with him? A. No, sir. ·

"Q. Didn't you make any reply? A. I might have asked him what he wanted.

"Q. Did he say that these enormous returns which were the result of his own inventions and his own work were going to those people who did practically nothing? A. No, sir; never that way."

"Q. Then, will you say that Mr. Wilson never said to you in substance this: That these enormous returns, which were the result of his own inventions and his own work, were going to those people who·did practically nothing? Didn't he say that, exactly that, to you? A. I don't remember it now. He may have.

"Q. Let me ask you: When·he may have been speaking about the enormous returns being the result of his own inventions, didn't he complain to you on that subject, complain bitterly? A. Complain bitterly, there is no doubt about it; but I don't remember about his inventions.

"Q. Didn't he say to you that he was sick of carrying this whole thing, and doing all the work, and dividing up with men who did nothing? A. Yes, sir."

"Q. Now, when he said these things which·you say he may have said, what reply do you remember that you made? A. I don't remember making any.

"Q. I wish you would give that thought. A. I might have asked him what he wanted when he was making these complaints. I very often asked him what he wanted."

"Q. Didn't you say that you would speak to Mr. Cloutman and Mr. Smith? A. It is just possible I did.

"Q. Yes. How many times did you say that? A. I don't remember."

"Q. Is it true that several times you asked Mr. Wilson what he wanted; that if he would tell you something that you could get the board of directors together and talk the matter over? Did you state that? A. I have asked him what he wanted; yes.

"Q. My question was more than that: Did you ask him several times what he wanted, and that if he would tell you something that you would get the board of directors together and talk the matter over? A. The last part I don't remember. The first part I have asked him a number of times.

"Q. Will you say that you never told him you would get the board of directors together to talk the matter over? A. I don't remember just making a statement of that kind.

"Q. Will you say that you didn't say it? A. I won't say anything. I don't remember saying I would get the board of directors together.

"Q. Will you say that you didn't say it? A. I won't say it."

There was little direct evidence concerning the two loom machines. In ·regard to these the auditor says:

"The second claim in the plaintiff's declaration is for compensation for the use of two circular looms constructed for and owned by the plaintiff, and covered by United States letters patent No. 690,355, which letters patent was the property of the plaintiff. The looms were devised by one Brown to weave a covering around the flexible tubing. Two such looms were constructed at the expense of the plaintiff and placed in operation in the defendant's factory, where they remained for about two years in more·or less constant use. It did not appear what, if anything, was said between the parties when these two looms were installed, or what was said when the plaintiff removed them from the defendant's factory a month or two before he was discharged. The plaintiff testified that he had a perfect right to remove the machines, as they

belonged to him, and he exercised the right. A right in the plaintiff to remove the machines when he wished is inconsistent with the plaintiff's claim that the defendant had a contract with him to pay for their use."

Almost the entire evidence, and the substantial controversy in the case, relate to the tubing machines. With respect to these machines, the evidence shows the following undisputed facts:

(1) It was one of the duties of the plaintiff's employment to improve the defendant's machinery.

(2) The plaintiff used the property of the defendant and the assistance of its other employés in developing and putting into practical form his invention. Stated in another way, the entire cost of all experiments in connection with the perfecting of this invention and the construction of a practically operative machine was paid by the defendant.

(3) The defendant also paid the expenses of taking out the patent.

(4) The defendant also paid for the machines which were installed in the defendant's factory under the direction of the plaintiff.

(5) In addition to these material facts, the salary of the plaintiff was raised from $1,800 to $5,000 per annum, and the plaintiff also had quite a large interest in the profits of the business.

Upon this state of facts, the defendant, under well-settled rules governing this class of cases, clearly had at least a shop right or implied license to use these particular machines without compensation. Solomons v. United States, 137 U. S. 342, 346, 11 Sup. Ct. 88, 34 L. Ed. 667; Gill v. United States, 160 U. S. 426, 435, 16 Sup. Ct. 322, 40 L. Ed. 480; McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102; Barry v. Crane Brothers (C. C.) 22 Fed. 396; Withington-Cooley Manufacturing Company v. Kinney, 68 Fed. 500, 15 C. C. A. 531; American Tube Works v. Bridgewater Iron Company (C. C.) 26 Fed. 334, 335; Magoun v. New England Glass Company, 3 Ban. & A. 114, Fed. Cas. No. 8,960; Blauvelt v. Interior Conduit Company, 80 Fed. 906, 26 C. C. A. 243; Barber v. National Carbon Company, 129 Fed. 370, 64 C. C. A. 40, 5 L. R. A. (N. S.) 1154; Fuller & Johnson Manufacturing Company v. Bartlett, 68 Wis. 73, 31 N. W. 747, 60 Am. Rep. 838.

This case, then, upon its face presents a state of facts in which the defendant had a shop right or implied license to use these machines without compensation; in other words, we have here a case in which the defendant was under no legal duty or obligation to pay for the use of these machines. This state of facts was not presented in the two cases relied upon by the plaintiff (Burton v. Burton Stock Car Company, 171 Mass. 437, 439, 50 N. E. 1029; Deane v. Hodge, 35 Minn. 146, 148, 27 N. W. 917, 59 Am. Rep. 321); and hence these cases, and other cases of the same class, have little or no bearing on the case at bar.

The precise question now before us is whether upon the evidence in this case the jury would have been warranted in inferring that the defendant agreed to pay the plaintiff a reasonable compensation for

the use of these machines. This is clearly stated by the auditor as follows:

"The burden is on the plaintiff to prove that there was an agreement between him and the defendant that he should be paid compensation for the use of the machines which the defendant would otherwise be entitled to use without compensation by virtue of its shop right. He must show that the minds of the parties had met and assented to the proposition that if the machines were used by the defendant company it would be obligated to pay him compensation therefor."

It is admitted that there was no evidence of an express agreement to pay for the use of these machines, and the only evidence of an implied agreement is the plaintiff's testimony of the conversations he had with Clark and Brooks, and Clark's testimony as to the conversations he had with the plaintiff. These conversations, taking the view most favorable to the plaintiff, went no further than statements by the plaintiff to Brooks and Clark that these machines were very profitable, and that he expected to be paid for their use, and that Brooks and Clark agreed with him. This evidence, in view of the other evidence in the case establishing the defendant's right to use these machines without compensation, is clearly insufficient to warrant the finding of an implied contract to pay for such use. In other words, assuming that the jury had believed the plaintiff's testimony, it surely cannot be maintained, merely because the plaintiff thought he ought to be paid for the use of these machines, and so informed two officers of the defendant who agreed with him, that this is sufficient proof of an agreement on the part of the defendant to pay for the use of something which it was entitled to use without compensation.

The view we take of this case, in respect to both the tubing machines and the two loom machines, is that, in the absence of any evidence of an express agreement on the part of the defendant to pay for the use of these machines, the court below properly directed a verdict for the defendant.

The judgment of the Circuit Court is affirmed, and the defendant in error recovers its costs of appeal.