McKINNON CHAIN CO. v. AMERICAN CHAIN CO., Inc.

(District Court, M. D. Pennsylvania. July 22, 1919.)

No. 253–A.

1. COURTS ⬿274—JURISDICTION OF FEDERAL COURTS—PATENT CASES—VENUE —"REGULAR AND ESTABLISHED PLACE OF BUSINESS."

A foreign corporation, which operates a manufacturing plant employing some 3,000 men in a judicial district in which it is alleged to have committed acts of infringement, held to have "a regular and established place of business" in the district for jurisdictional purposes, under Judicial Code, § 48 (Comp. St. § 1030), although its principal place of business is in another state.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Established Place of Business.]

2. PATENTS ⬿210—MACHINE BUILT FOR ANOTHER—IMPLIED LICENSE.

Where a new machine was built for defendant, according to ideas of defendant's superintendent and with the understanding that if successful a large number would be required, but was afterward patented by the builder, defendant held to have an implied license to make and use as many of the machines as required in its business.

In Equity. Suit by the McKinnon Chain Company against the American Chain Company, Incorporated. Decree for defendant.

Mitchell & Staples, of Buffalo, N. Y. (L. P. Whitaker, of New York City, of counsel), for complainant.

Frederick S. Duncan, Oscar W. Jeffery, and John H. Hilliard, all of New York City, for defendant.

WITMER, District Judge. This suit was instituted to restrain by injunction the defendant from manufacturing, using, or selling an automatic chain forming machine covered by letters patent No. 1,023,126, and for an accounting to plaintiff for damages sustained by alleged infringement.

The plaintiff, McKinnon Chain Company, is a corporation organized and existing under the laws of the state of New York and having a regular and established place of business at Buffalo, said state.

[1] The defendant, American Chain Company, Incorporated, is a corporation organized under the laws of the state of New York, and is the successor to the entire business and good will of the Standard Chain Company, which formerly conducted the manufacture of chain at its several plants, including those located at Marion, Ind., Columbus, Ohio, Braddock and York, Pa. The defendant's business

office is located at Bridgeport, Conn., from which it conducts its buying and selling operations and gives instructions for the operation of its various works, including the York plant, where the alleged patented machines were in use.

The court's jurisdiction is challenged on this showing. It is contended that defendant has not such "regular and established place of business" at York as to confer the jurisdiction contemplated by section 48 of the Judicial Code. Act of March 3, 1911, c. 231, § 48, 36 Stat. 1100 (Comp. St. § 1030).

While the defendant's business of buying and selling is negotiated, and no doubt a general supervision of all of its plants maintained at its office at Bridgeport, it is equally certain that it has a regular and established business at York, of manufacturing at least some of the product that it puts upon the market. Here some 3,000 men are employed, and a large and valuable plant, equipped with the latest machinery, is established to accomplish this end. However, the statute, in order to confer jurisdiction, also requires that acts of infringement shall have been committed in the district where such place of business is established, and this brings us to the merits of the case.

[2] Among the defenses relied upon by the defendant is that of implied license on the part of the Standard Company, and its successors, to make or have made, and to use in its business of chain making, as many machines of the construction indicated in the patent as might be needed by them, which implied license arose out of the circumstances surrounding the laying out and building of the initial machine, which was afterward patented, and has since in a slightly modified form been in use at the York plant. The conclusion reached requires consideration only hereof.

Early in the year 1905 the Automatic Machine Company of Bridgeport, Conn., of which James Coulter was president, was engaged by the Standard Chain Company to build an automatic machine which would form a chain link in such manner or form that the same could be automatically welded by electricity. Prior to this time no such machine had been constructed in this country. The Standard Company which was the largest manufacturer, like all other chain-making concerns here, made all of its welded chain by the hand process of fire welding, which consisted in heating the links in a furnace and then welding the ends together either by blows of a hammer operated by hand or by the hand-directed blows of a mechanical welder. Though chain of various formed links were being made on machines working automatically, all of them so made were of the open or unwelded link type and were so constructed that the links could not to any large degree of success be welded by electricity.

Carleton L. Hoff, superintendent of the York plant of the Standard Chain Company, satisfied by diligent research and study of the possibility of electrically welding chain, interested John C. Schmidt, president of the company, and after some investigation through Mr. Davis, general manager, of the electric welding of chain as then attempted in France and Germany, the Standard Company itself actively took up the introduction and development of electric welding. The assis-

tance of the Thomson Electric Welding Company, of Lynn, Mass., was sought. On November 8, 1904, Mr. Hodges, secretary and manager, met Schmidt and Hoff at York for consultation regarding the building of electric welding machines to weld links in chain that Hoff proposed to produce on a chain-forming machine that the Standard Company was to have made. The character of chain in mind of Hoff, as mentioned to Hodges for welding on the machine to be built by him, was one with opening or joint at the side of links. The electric welding to be done by feeding such chain into a welding machine provided with electrodes that would grasp the ends of each link close to the point and cause the ends, when heated by passing of an electric current, to be welded by the pressure of arms forcing the ends together. The chain forming was to be accomplished by automatic machine, the wire being fed into the machine, cut off in suitable length, bent around a mandril, into the form of a link and each link turned on and so that the next incoming piece of wire would be threaded through the link, thus producing continuous chain.

The Thomson Company undertook to furnish the welding machine needed, and the Standard Company the machine for forming the characteristic chain required.

This suit has only to do with the effort and success in obtaining the latter.

That the patented machine was built by James Coulter, the patentee, on behalf of the Automatic Company at the instance and solicitation of the Standard Company and for its use, is not denied. On what condition and by whose request and if any assistance is in controversy. On behalf of the defendant, it is insisted that Hoff took up with Coulter the construction of the machine wanted by the Standard Company, that he gave advice and assistance with the understanding that the company should have such additional machines as were required by it in its business. All of this is denied on behalf of plaintiff, with the exception of the possible admission that the machine made was ordered by the Standard Company through Robert Garland, its vice president, and that Hoff was not known in the transaction until the machine was ready for inspection. This does not seem probable, and, having heard the witnesses and considered their testimony, the court does not so find. On the part of the Standard Company, Hoff was the moving active spirit in behalf of electric welding and automatic chain making, assisted by Schmidt. He was familiar with the manufacture of unwelded chain by automatic machinery and was engaged in the business since 1895, having manufactured the Schmidt chain on a machine constructed for the purpose by Martin O. Rehfus of Philadelphia. About the year 1900, he also devised and patented two new forms of unwelded links and consulted Rehfus about the building of an automatic machine to produce chain of the links devised. He made a study of the patents of chain-forming machines and the practicability of manufacturing chain by electric welding. He satisfied himself of the particular form of link required to accomplish this end and the kind of machine required to produce it. As he disclosed his conception to Rehfus, Adolph Reitzel, superintendent of the Thomson

Company, and A. H. Nilson, builder of automatic machinery, and others, he had concluded that the familiar Rehfus machine used by him to produce the Schmidt chain could be utilized with some modification to construct the chain with simplified link appropriate for electric welding. It appears but natural that Garland should bring Hoff and Coulter together upon the matter in hand. The latter was formerly in his employ and had his confidence as a skillful mechanic and builder of automatic machinery. The former was then in the employ of his company and had made a study of the undertaking to weld chain by electricity and had undertaken to produce for his company a machine for making automatically the necessary chain required. That he did bring them together as testified and previous to the meeting between Garland and Coulter at the Waldorf Astoria about the middle of February, 1905, is not doubted.

What is more reasonable than that the ordering of the machine which was then as yet in the mind of Hoff should and would be intrusted to him. It was his undertaking and effort and it was intrusted to him. He met Coulter and explained his mission and showed him how the old Rehfus machine could be altered and utilized. Coulter denies this, but a study of the modified product disclosed to Rehfus, Reitzel and Nilson, and patented by Coulter bears silent testimony. True, Coulter met Garland and Schmidt in New York and talked the matter over, discussing the contract for the building of the machine and the possibilities of a number of additional machines required, if the same should prove successful, and, though Garland testified Hoff was present at this meeting, Hoff frankly states that he was not present and that Garland was mistaken. The disagreement between Hoff and Garland, when carefully considered, serves rather as convincing proof of their honest intent each in his own way to tell the truth than to fabricate a case.

That Hoff had a meeting with Coulter at Bridgeport prior to his visit to New York, and that he there explained to him the general layout and detail of the machine he had in mind, and which he proposed to have built for the Standard Company for forming chain with a view of electrically welding such chain, is not doubted, and that Coulter on behalf of the Automatic Company undertook to and did build such machine for the Standard Company with the hope and understanding that large orders would follow if successful for use by the Standard Company is equally well established.

After several conferences between Hoff and Coulter, the machine was shipped to York and set up for use in the company's plant. Its success was at first indifferent and was only turned to good account after some important changes and alteration by Hoff. Neither Hoff nor any one else connected with the Standard Company considered the laying out of the proposed chain-forming machine required anything more than the ordinary shop skill of an experienced builder of automatic wire bending or chain forming machinery. The idea that invention was involved did not enter any one's mind. It is even doubtful whether Coulter thought of it until it was suggested by Michael B. Ryan, connected with the Automatic Company, at whose instance

and for whose benefit the patent was applied. The Standard Company having endeavored since then to purchase additional machines from the Automatic Company without avail, since procured and installed at its plant for use more than 100 machines of the type. Though machines were not furnished when required soon after request was made, Ryan, then assignee of Coulter's application, offered to Schmidt, president of the Standard Company, for sale the exclusive rights under the Coulter application. No claim was made at this time that the company did not have the right to obtain and use for its own purposes such machines covered by the Coulter patent as it needed in its own business. This offer was rejected by the company as stated by Hoff, partly because the company considered it already had the right to use in its own business machines of the design built by Coulter at its instance.

That the Standard Company has the right to the use of the machine constructed and delivered to the company at its instance is not to be considered. The matter here presented is whether defendant is entitled to the use of as many more machines of its type as required in its business, under the particular facts as developed; it appearing that Coulter was approached and employed in a semiprofessional capacity by the Standard Company for its individual benefit, having divulged to him its plans in regard to the development of the electric welding of chain, explaining to him so much about the chain-forming machine and the details of the forming and bending mechanism thereof as to enable Coulter to produce a machine that embodied the forming and bending tools of the Rehfus machine owned by the Standard Company with such modifications as were obviously necessary to make the new form of link; and Coulter having accepted the information intrusted for the purpose of assisting in developing the chain-forming machine for the particular needs of the company knowing that it was to be undertaken by him without limitation to one machine, but with the expressed understanding that a large number of machines of its kind would possibly be required and ordered from his company if the machine proved a success in the development in the manufacture of chain by electric welding. To negative this proposition is to enable Coulter to prevent the Standard Company from reaping the fruits of its effort, and the very object in securing the assistance of Coulter in the undertaking of the development of the chain-making process through the use of the required machine. To confine the company to the use of one machine would indeed be contrary to the original intention of the parties to the undertaking. The business required more machines; in fact, many machines were needed if chain making could be carried on through the use of them successfully and commercially. The purpose was that these should be obtained and used when needed. This was made known to Coulter before he accepted employment, and it is therefore presumed that he proceeded to work with this in mind. It would indeed be contrary to equity and fair dealing if Coulter should now have such control of the situation as to enable him to arbitrarily deny the company the use of as many more machines as it originally had a right to expect in the development of its

business. This cannot be tolerated. The license to use is not confined to the machine delivered but to as many more as were intended to follow as understood by the parties to the undertaking.

As was said ·in Withington Cooley Co. v. Kinney, 68 Fed. 500, 15 C. C. A. 531:

"The duration and scope of the license must depend upon the nature of the invention and the circumstances out of which an implied license is presumed, and both must at last depend upon the intention of the parties."

The opinion of the court follows the principle expressed in Robinson on Patents, §§ 809, 810, and in Montross v. Mabie (C. C.) 30 Fed. 234. Summing up the authorities of the federal courts, the principle ·has been generally expressed that, where the designing or creating of such machine or process even involves invention and a patent is taken out, it is well established that the person for whose benefit such creating was done is entitled to an irrevocable license to the use of said patent to such extent as may be necessary to secure the beneficial rights in question. Wilson v. Wilson Corporation (D. C.) 241 Fed. 494, at pages 496 and 497; Montross v. Mabie (C. C.) 30 Fed. 234; Solomons v. United States, 137 U. S. 342, 11 Sup. Ct. 88, 34 L. Ed. 667; Anderson v. Eiler, 50 Fed. 775, 1 C. C. A. 659; Withington Cooley Co. v. Kinney, 68 Fed. 500, 15 C. C. A. 531; Barber v. National Carbon Co., 129 Fed. 370, 64 C. C. A. 40, 5 L. R. A. (N. S.) 1154; Schmidt v. Central Foundry Co. (D. C.) 218 Fed. 466; McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102. In the case of Barber v. National Carbon Company, noted, the court said:

"The evidence does not show any contract by which Barber was to make inventions or devote his inventive faculties to the service of the Carbon Company, or any agreement that any inventions should belong to the employer, or any patent which he should obtain thereon. It does show that he was employed because he was a mechanical engineer, and that he ·was expected to devote his time and service to the cheapening of the processes used by the Carbon Company. But nothing was said upon the subject of inventions, or the use of his inventive faculties for their benefit, unless an agreement to devote his knowledge, skill and service to the cheapening and improving of the processes in the factory involves the inventive faculty also. * * *

"When he built his first machine, he placed thereon plates with an inscription thereon, 'Patent Applied For.' As this machine was started, the officers and directors were called in to inspect it. It is impossible to believe that these facts escaped their observation. The fact that the plates were thus conspicuously affixed is at least indicative of Barber's intention to protect his invention with a patent, and we can but believe that this fact was also known to his corporation."

Though Barber, to the knowledge of the employer, claimed full rights to the invention during the building of his first machine, the court held the company entitled to an implied license to the extent of the use of the machines contemplated by the company to Barber's knowledge.

In the case of Anderson v. Eiler, supra, decided by the District Court of this circuit, the plaintiff, being the inventor and patentee of a design patent for mantels, prior to the application for the patent, sold two mantels, made after the patented design, to Mershon, Brown.

& Co., who in turn sold similar devices of their own make to the defendant. In an action to enjoin infringement, Judge Butler said:

"It appears that Mershon, Brown & Co., who are manufacturers of mantels, wishing to use this design (not then patented) purchased from Mr. Anderson (through an agent) two of his mantels, as samples, for this purpose. The agent explicitly informed him of their object in the proposed purchase, as the proofs show, and as he admits. He thus sold the mantels with knowledge that the only object in purchasing was to copy and use his design, and did it without objecting to the use contemplated. The inference is therefore, we think, irresistible that he consented to this use. Whether he actually consented or not, however, the circumstances estop his denial. His silence at the time closes his mouth. If he did not mean to consent, he should have said so. Such denial now, and a recovery of damages for infringement, would constitute a fraud. It is true that the sum paid for the mantel was not large; no more than the usual price for their common use. Whether it was disproportioned to the value of the special use mentioned depends upon the question whether a monopoly in the design was then contemplated by either party. Clearly, Mershon, Brown & Co. did not contemplate it. They supposed the design was open to the public, and virtually declared so at the time. Whether Mr. Anderson then intended applying for a patent is not clear. He did subsequently, though somewhat tardily, apply. But whether the sum was disproportioned to the value of the special use is not important, in view of the fact that this use was distinctly in the minds of both parties, and that the money was paid and received on the basis of it."

As the plaintiff in the cited case "sold the mantel with knowledge that the only object in purchasing was to keep and use his design and did it without objecting to the use contemplated," so in the case here did Coulter sell the original chain-forming machine to the Standard Company with knowledge that the Standard Company's object in purchasing it was to utilize it not only for the practical manufacture of chain, but as a design for the construction or procurement of further machines. It does not matter that Coulter made no answer in response to this announcement by Hoff, for, "whether he actually consented or not, * * * the circumstances estop his denial. His silence at the time closes his mouth. If he did not mean to consent, he should have said so," and whether the sum paid was disproportioned to the value of the special use is not important in view of the fact that this use was distinctly in the minds of both parties and that the money was paid and accepted on the basis of it. However, the consideration flowing from the Standard Company to Coulter under the testimony appears adequate, judging from bids received for the building of similar machines, and bearing also in mind that Coulter was engaged and rendered service, not as an inventor, but simply as an experienced mechanic and builder of machines, and, with the hope of having the preference of building the large number of machines required in the defendant's business, he fixed his compensation.

It may also be further noted that until this suit was instituted no one interested objected to the use by defendant of the machines of the patented design, though it is well established that since May, 1906, when President Schmidt of the Standard Company wrote to Coulter relative to ordering other machines, down to this date, some of the active parties interested in its exclusive control were acquainted with the use made of them in defendant's place of business.

The bill is dismissed, at the cost of plaintiff.