### NEON SIGNAL DEVICES, Inc., v. ALPHA-CLAUDE NEON CORPORATION.

#### No. 2557.

District Court, W. D. Pennsylvania.

Dec. 12, 1931.

Byrnes, Stebbins, Parmelee & Blenko, of Pittsburgh, Pa., for plaintiff.

Brown & Critchlow, of Pittsburgh, Pa., for defendant.

THOMSON, District Judge.

This litigation arises over letters patent No. 1806429, dated May 12, 1931, granted on the application of the inventor, William B. McGill, to Neon Signal Devices, Inc., as assignee, covering a certain improvement in traffic signals.

The bill alleges infringement and prays for an injunction restraining the defendant from the manufacture, sale, or use of the patented device. The validity of the patent is not controverted, but infringement is denied because defendant claims it possesses an irrevocable, equitable license or shop right to manufacture, use, and sell the invention disclosed and claimed in the letters patent.

This raises a single issue, viz., the existence of the shop right in question. This right must be determined under the facts of the case and the principles of law applicable thereto.

The nature of an equitable license or shop right very clearly appears in the authorities, depending, in each particular case, on the circumstances disclosed.

The doctrine of the shop right is of equitable origin. The principle involved is that where an inventor or owner of an invention acquiesces in the use of the invention by another, particularly where he induces and assists in such use without demand for compensation or other notice of restriction of the right to continue, he will be deemed to have vested the user with an irrevocable, equitable license to use the invention. This situation between the inventor and employer might, of

course, arise by mutual agreement, but generally the situation arises where the inventor induces his employer to proceed and not only fails to object to the use, but stands by or assists, while permitting his employer to assume expense and put himself in a position where it would be to his detriment to be compelled to relinquish further use of the invention. McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102; Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667; Gill v. United States, 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480.

The doctrine is aptly set forth in Walker on Patents (6th Ed.) vol. 1, p. 442: "Where a man is employed by another party, to work in a particular business of the employer; and where, at any time before the end of that employment, he conceives an invention which appears to be applicable to his employer's business; and where during that employment, he uses the property of the employer in reducing that invention to practice; and where he sees the employer thereupon proceed to make, use, or sell, specimens of that invention, and does not thereupon demand any present or prospective compensation therefor, on account of any present or prospective patent thereon; an implied license or shop 'right' results to the employer, under any patent that may be granted on that invention, in pursuance of any application of that employed man."

The case of Tin Decorating Company v. Metal Package Corporation et al. (D. C.) 29 F.(2d) 1006, which was affirmed by the Second Circuit Court of Appeals, at 37 F.(2d) 5, reviews the authorities and sets forth the doctrine with precision and clearness.

While it is generally true that questions of shop right arise between employer and employee, such right is not restricted alone to the case of an employer, as the doctrine is only a phase of the broad doctrine of estoppel. A shop right may arise through any permissive use of the invention, and particularly so where the inventor instigates such use and participates in it. Robinson on Patents, vol. 2, p. 641, explains and illustrates such a situation.

The doctrine is broad enough to include a case of the permissive use of a person other than an employer. De Forest Radio v. U. S., 273 U. S. 236, 47 S. Ct. 366, 367, 71 L. Ed. 625. In this case it was held that the government of the United States had an implied license to practice an invention where the rights were owned by a corporation not an employee of the United States. Mr. Chief

Justice Taft in this case said: "No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort."

■ Naturally, the scope of an implied license depends upon the circumstances which created it, and it rests ultimately upon the intention of the parties. Withington-Cooley Mfg. Co. v. Kinney (C. C. A.) 68 F. 500, Tin Decorating Co. v. Metal Package Corp., supra.

Like all equitable doctrines which have ultimate justice only in view, the doctrine we are considering has been greatly enlarging the rights of the employer and increasing the scope of his license.

■ Turning now to the evidence:

There is much conflict of testimony, and out of this conflict and the conceded or clearly established facts, the court has endeavored to determine the material and controlling facts upon which the issue must turn. These, I find to be as follows:

The Gardner Sign Company was incorporated in 1928, its business consisting in the manufacture and sale of advertising signs, largely those using Neon tube illumination. The president of the company was William Gardner, who occupied that position up to the time the company was taken over by the Alpha-Claude Neon Corporation, the present defendant. The treasurer and general manager of the company during its entire life was C. E. Rafter. For the sake of brevity, the Gardner Sign Company will be referred to as the Gardner Company and the Alpha-Claude Neon Corporation, as the Alpha Company.

Some time in the late spring or early summer of 1929, McGill made to the officers of the Gardner Company the suggestion that they bid for traffic signal business, which was then in contemplation by the city of Pittsburgh; McGill, at the same time, disclosing an idea concerning the construction of such signs. At that time, McGill had been employed for some weeks by the company, but this was the first that Gardner had heard about McGill's idea.

Both Rafter and Gardner were interested in McGill's suggestion, and the latter was authorized to proceed with the development

of his ideas at the expense of the Gardner Company. McGill was not only active in inducing the Gardner Company to enter this field, but was active in developing improvements in his original idea, and actively participated in seeking and obtaining the city order.

As the matter proceeded with the city, it became necessary to build several models, varying in their essentials, before a construction was obtained which was satisfactory to the city officials, and this construction is that covered by the patent. These models, representing changes in construction, were made on the premises of the Gardner Company and at their expense.

The Gardner Company obtained the city contract for a total of 107 signals, after submitting various models to the city, and McGill was instrumental in securing this order. As it was then situated, the Gardner Company was not equipped to undertake the manufacture of these signs, and had to purchase the tools to complete the order.

McGill supervised the construction and installation of these signs, both for the Gardner Company, and for its successor, the defendant herein. The Gardner Company attempted to sell the signals, generally to municipalities, and McGill participated in those efforts.

When McGill was first employed by the Gardner Company, he was paid a commission determined by his sales. That mode of payment continued until after the contract had been awarded to the city of Pittsburgh. He was then placed on a flat salary, which was considerably greater than his average weekly commissions, as shown by the company's books. By way of additional compensation for the time of development of the aforesaid models, McGill was paid, retroactively, for the period of three weeks, the sum of $180. He also received a commission of $5 for each of the signs sold, or a total of $535. He made no demand for royalty, as shown by his own testimony.

From these material and vital facts so found, a shop right would arise in the Gardner Company unless it be overthrown by other circumstances.

Plaintiff seeks to overcome the effect of the foregoing facts by alleged notice that the company's rights were restricted to the Pittsburgh order alone. This position rests for support largely on the testimony of McGill and a letter dated January 3, 1930, written by McGill, directed to the attention of Mr. Rafter, treasurer of the Gardner Company. This letter is as follows:

"Dormont, Pa., Jan. 3, 1930. .
"Gardner Sign Co.,
    "Pittsburgh, Pa.
"Dear Sirs: Attention of Mr. C. E. Rafter, Treasurer.

"I am writing this letter as a matter of record to confirm verbal understanding between us with reference to my invention in Traffic Signals.

"You will recall that this development was entirely my own, that the patent application was filed in my name and at my expense, and that it was our clear understanding that the exclusive rights in the invention are mine.

"The contract for signal lights for the City of Pittsburgh, now being filled by your company, was taken with my knowledge and permission, and I make no claim for royalties or other compensation for the use of my invention in the filling of this one order constituting not in excess of 110 traffic Signals. This waiver by me of royalty is in consideration of all claims of The Gardner Sign Co., against me for experimental work, testing or the like, since the understanding was that you should be free to take this one order but were to enjoy no further rights of whatsoever character in the invention.

"It is my expectation to commercialize the invention through other channels, and I expect to ask certain people to make substantial investments in the promotion of the invention on the strength of my explanation to them of the above arrangement and my representation that beyond the right to fill this one order, The Gardner Sign Co., has no interest whatever in the invention.

"I am therefore sending you this letter by registered mail with the request that you promptly notify me in writing in the event that your understanding as to the agreement now existing between us differs in any particular from the above statement of it.
    "Yours very truly,     B. B. McGill."

This letter, so vital to the plaintiff's case, under all the circumstances which surround it, requires the most rigid examination.

A reasonable length of this opinion forbids me to detail the evidence pro and con bearing on the question of notice, or stop to give my reasons for assigning, to various items of evidence, their respective probative values. I will be contented largely with stating my conclusions.

On the whole, I was not impressed with the candor of McGill, a vitally interested

witness, and have felt compelled to discount the effect of his testimony when brought in conflict with other disinterested, and apparently credible, evidence. As to the letter itself:

It sets forth a purported verbal agreement existing between him and Rafter, the treasurer of the Gardner Company, the letter being written to confirm an alleged verbal understanding between them. The fact that the important paragraphs of the letter are denied by Rafter; that Gardner, the president of the company, never saw the letter until called to his attention just previous to the trial; that although McGill was in close and intimate relationship with Gardner, he never made known to him his possession or claim of any patented rights, which would prevent the Gardner Company from continuing the business of manufacturing and selling the signals in question; that although Rafter was not present when the case was first called for trial, and his deposition had not been taken, the plaintiff strenuously opposed continuing the case for the taking of his deposition; that plaintiffs were thus endeavoring to rest the fact of notice on the letter alone, although McGill was ready to testify, and afterwards did testify, that the letter was written at the instigation of Rafter, which fact, if true, was a vitally important matter; that the deposition of Rafter disclosed no such understandings or agreements as are asserted in the letter and asserted also by McGill; that the position that Rafter requested or instigated the letter was, for the first time, brought out at the trial, after the deposition had been taken; that although plaintiff's counsel had frequently discussed the letter itself with defendant's attorneys prior to the trial, he did not disclose to them Rafter's connection with the letter, except the fact that he had received it; the fact that Gardner Company intended to go into the traffic signal business and attempted to sell the signals generally to municipalities and the like; that McGill knew of this and participated in it, and tried to interest others in the signal for the benefit of the Gardner Company; the very unusual circumstances under which the letter was written, temporarily lost in the files, and its contents never made known to the company; the apparently uncertain knowledge and confusing or conflicting statements of counsel for plaintiff as to the scope of the Gardner Company's rights, although he had drafted the letter which very emphatically denied the existence of any shop right—these, and other considerations which might be mentioned, inevitably lead the court to the conclusion that the alleged notice set up by the plaintiff to overthrow the shop right of the Gardner Company is insufficient to effect that purpose.

■ We here reach the final question in the case, viz.: Did the shop right existing in the Gardner Company pass to the defendant corporation?

It may be conceded, under the authorities, that a shop right is a personal right, and does not pass by mere assignment; but on the other hand, it seems to be the established law that a shop right can and will pass where there is a complete succession to the entire business and good will of the licensee. Walker on Patents (6th Ed.) vol. 1, p. 437, says: "Unassignable licenses may sometimes be invoked by persons who are not exactly identical with the licensees. A railroad company which was formed by the consolidation of prior railroad companies, may invoke the licenses which were given to either of its constituent corporations; because the consolidated company is a successor rather than assignee of those companies." The same author says at page 433: "And the benefit of such an implied license will pass to the assigns or the successors of the employer, according to the particular circumstances which may justify such passage in particular cases, respectively. (Cases cited.)"

A leading case on this subject is Lane & Bodley v. Locke, 150 U. S. 193, 14 S. Ct. 78, 79, 37 L. Ed. 1049. Locke sued Lane & Bodley, a corporation, for the infringement of Locke's patent. Defendant set up a shop right asserted to have passed to it from its predecessor, Lane & Bodley, a partnership. Locke had worked for the partnership, and the invention in suit had been made during such employment. He continued on the pay roll of the corporation after it had taken over the partnership business. He had permitted the defendant and its predecessor partnership to use the invention continuously. The Supreme Court held that, under these circumstances, the corporation succeeded to all the rights of the firm under the shop right which was found to have been created.

The court, in dismissing as inapplicable, the case of Hapgood v. Hewitt, 119 U. S. 226, 7 S. Ct. 193, 30 L. Ed. 369, said: "In none of those cases was there evidence showing a recognition, implied or express, by the patentee of any right in the assignee." The opinion further states: "In Hammond v. Organ Co., 92 U. S. 724, [23 L. Ed. 767], it was held that the nonassignability of a license may be waived if the patentee ratifies the transfer of the license, by otherwise treating

the assignee as the licensee was entitled to be treated." To the same general effect are the cases of Lightner v. Railroad Company, 1 Lowell, 338, Fed. Cas. No. 8343, Wilson v. J. G. Wilson Corporation (D. C.) 241 F. 494, 497.

In this last case, the patents were taken out in Wilson's name, and although he never demanded any royalty, the company used them. Upon the withdrawal of the president of the predecessor company, a new company was formed which took over the entire assets of the old company and continued its business. The plaintiff remained in the employ of the new company for a short time. The defendant set up an irrevocable license to use the inventions, grounded upon its having succeeded to the business of the old company. In sustaining this defense, that is, the transfer of the shop right, the court said: "The suggestion that the right in and license to use said letters patent is a personal one, existing in favor of the James G. Wilson Manufacturing Company, and does not, in the absence of an express contract, pass to the defendant company, is not well taken, and cannot be maintained, for the reason that the defendant company is but a continuation of its predecessor company, and the complainant in good faith and fair dealing is as completely estopped from claiming the right here set up against one as the other."

In McKinnon Chain Co. v. American Chain Co., Inc. (D. C.) 259 F. 873, in this circuit, the defendant was the successor for the entire business and good will of a corporation known as the Standard Chain Company, which had a shop right under the patent in suit. An implied license in the defendant and its successors to make or have made and use the patented machines was sustained by the court. See, also, Dunkley v. California Packing Corporation (C. C. A.) 277 F. 996. Applying these principles to the case in hand, the evidence is practically uncontroverted that on February 8, 1930, the Alpha Company, this defendant, succeeded to the entire business, good will, assets, and liabilities of the Gardner Sign Company, and thereafter continued its entire business; the Gardner Company ceasing to function as an active organization; the exhibits offered in evidence showing that defendant paid a valuable consideration for its acquisition of the Gardner Company, and that franchises and patents were among the assets which it acquired. A shop right, such as is here in issue, may be properly considered as embraced under these heads. The record shows that the Alpha Company, having assumed all of the assets and liabilities of the Gardner Company, moved into its offices, answered inquiries directed to the Gardner Company, continued Gardner's sign service contracts, completed the installation of the signals for the city of Pittsburgh, and generally continued the business that had been carried on by the Gardner Company, while the latter company ceased business as of the date of the transfer.

Under the authorities, it would seem reasonably clear that under these facts, the shop right in question passed. But in addition to these facts, McGill entered defendant's employ, worked on the city signals, gave no notice of claim of exclusive patent right to defendant, and was secretly organizing this plaintiff while so employed.

The same circumstances which constituted ratification of the transfer of the shop right to the defendant also show, or tend largely to show, that a shop right was in fact created in the defendant. McGill, the patentee, entered defendant's employ, accepted remuneration from the defendant having notice of the question of shop right, assisted in completing the city order, and while doing these things, failed to object or give any notice whatever until long after he had left the defendant, and until the Alpha Company had entered upon an order for signals for the city of Philadelphia shortly prior to filing the bill. In and of itself, these facts might be held sufficient for the creation of an equitable license in the defendant.

In reaching the conclusions arrived at, the court feels that the equities of the parties have been recognized and maintained. The recognition of defendant's shop right does not interfere with or restrict plaintiff's right to make and sell the signals in question, and to exclude all third parties therefrom.

The bill fails because of plaintiff's failure to establish infringement in the face of the shop right or equitable license found in defendant's favor.

A decree will therefore be drawn, dismissing the bill with costs, and decreeing a shop right in the defendant corporation.