**PPG INDUSTRIES, INC., Plaintiff,**

**v.**

**GUARDIAN INDUSTRIES CORPORATION,**
**Defendant.**

**No. C 72–71.**

United States District Court,
N. D. Ohio, W. D.

Jan. 26, 1977.

Robert B. Gosline, Toledo, Ohio, William H. Webb, Pittsburgh, Pa., for plaintiff.

James R. Jeffery, Toledo, Ohio, Bernard J. Cantor, Cullen, Settle, Sloman & Cantor, Detroit, Mich., for defendant.

## OPINION AND ORDER

WALINSKI, District Judge.

PPG Industries, Inc. [hereafter PPG] brought this action charging Guardian Industries Corporation [hereafter Guardian] with infringement upon eleven of its patents. Two of the patents, Nos. 3,223,501 and 3,293,015, originated as the result of development work carried out at PPG. The remaining nine patents, Nos. 3,281,229, 3,282,447, 3,291,590, 3,332,759, 3,332,760, 3,332,762, 3,338,697, 3,399,042, and 3,402,036 originated as the result of development work carried out at Permaglass, Inc. [hereafter Permaglass], a corporation which merged into Guardian in 1969.

Guardian has raised the defenses of license, patent invalidity and non-infringement. Because resolution of the license defense in Guardian's favor would be dispositive of some or all of the patents in suit and would thus eliminate the need for trial on the validity and infringement issues, the Court ordered an evidentiary hearing limited to the license defense. Fed.R.Civ.P. 42(b). *See generally* 5 J. Moore, *Federal Practice* ¶ 42.03 (2d ed. 1976). Trial on this issue was had before the Court on August 8 and 9, 1976. Post-trial briefs have been submitted and the matter is now ripe for determination. As authorized by Rule 52(a), the Court's findings of fact and conclusions of law will be set forth in the memorandum which follows.

I.

Guardian's two-pronged license defense is based on two separate agreements entered into by PPG and Permaglass in 1964 and 1969. The first prong of Guardian's de-

fense is based on the 1964 agreement. In that agreement Permaglass was granted a "non-exclusive, non-transferable" license to use the patents in suit. Guardian argues that as a result of the 1969 statutory merger of Permaglass into Guardian it succeeded to these license rights notwithstanding the transferability restriction contained therein. Before discussing the merits of Guardian's 1964 license defense it will be helpful to briefly set forth the facts surrounding both the 1964 license agreement and the 1969 merger.

Permaglass was an Ohio corporation founded in 1948 by Harold A. McMaster. Initially Permaglass' business was limited to the tempering of flat glass pieces used in the appliance and automotive industries. Subsequently, McMaster and others employed at Permaglass began working on the "gas hearth" or "air float" process. In this process glass is supported on a bed of hot air while being bent and tempered.

In 1963, after completing experimental work, Permaglass constructed its first gas hearth line in Millbury, Ohio. Production on this line began in August of 1963. At about the same time Permaglass discovered that PPG had also been working, independently, on this same technology.

Permaglass then entered into discussions with PPG in an effort to determine where it stood in relation to PPG's patent position. Ensuing negotiations resulted in the January 1, 1964 license agreement.

In the 1964 agreement Permaglass granted to PPG an "unlimited exclusive license, with right of sublicense" to use its patents and technical data. § 3.2. From this grant, however, Permaglass reserved a "non-exclusive, non-transferable, royalty-free, world-wide right and license" for its own use. § 3.3. The license so reserved was to be "personal" and non-assignable. § 9.2. This reserved license applies to nine of the eleven patents in suit.

In return for receiving the licenses described above, PPG granted Permaglass a "non-exclusive, non-transferable, royalty-free right and license" to use PPG gas hearth patents. § 4.1. This license was also "personal" and "non-assignable except with the consent of PPG first obtained in writing." § 9.2. Moreover, the license under the PPG patents was to terminate in the event that a majority of the voting stock of Permaglass at any time became owned or controlled by another manufacturer or fabricator of glass. § 11.2. This license, and the termination clause applicable thereto, applies to only two of the eleven patents in suit.

In 1969, Harold McMaster, then President of Permaglass, learned that Guardian had announced plans to construct its own raw glass-producing facility and that the facility's proposed output would exceed Guardian's needs. He then approached Edward Sczesny, Director of Engineering and Corporate Planning at Guardian and suggested that a merger of Permaglass and Guardian would benefit both corporations.

At the time of the merger Guardian was primarily a manufacturer of windshields for the automotive industry. Some of these windshields were sold directly to bus and truck manufacturers for use as original equipment. The remaining windshields were sold through a national distribution complex. Guardian's sales approximated 15 million dollars annually.

Permaglass was a manufacturer of architectural glass and tempered glass for automobile back and side windows. It did not manufacture its own raw glass. Permaglass' annual sales approximated 10 million dollars.

The raw glass-producing facility that Guardian planned to construct was expected to generate 20 million dollars in sales. Guardian's needs, however, amounted to about 8 million and an outlet for the remaining raw glass was needed. Because Permaglass was a raw glass purchaser the proposed merger would reduce Guardian's need to locate consumers for its excess raw glass.

A merger of Guardian and Permaglass would also make the resulting company more competitive in the original equipment market. Automobile manufacturers prefer

to purchase their glass needs from a company that produces glass for the entire vehicle. The merger would create an organization capable of producing windshields as well as back and side windows.

Subsequent negotiations between the two corporations resulted in an Agreement of Merger, executed on October 7, 1969, pursuant to which Permaglass was merged into Guardian. Permaglass shareholders surrendered their shares and received shares of Guardian in return and the separate corporate existence of Permaglass ceased.

After the merger Guardian continued to operate the furnace units that had been constructed and operated by Permaglass. Guardian did, however, construct one additional furnace unit at its Carleton, Michigan Plant in 1973.

Because Permaglass was an Ohio corporation and Guardian a Delaware corporation, the merger was consummated in accordance with the laws of the respective states. Both states authorize a merger of a domestic corporation with a foreign corporation. Ohio Revised Code § 1701.82; 8 Del.C. § 252(a). Section 1701.83(B)(3), Ohio Revised Code, provides that the effect of the merger shall be the same as in the case of a merger or consolidation of domestic corporations "except in so far as the laws of such other state otherwise provide." [1]

■ Section 1701.81(A)(4) provides that when the merger becomes effective the surviving corporation shall possess all the "property of every description, and every interest therein." Delaware law is substantially the same. 8 Del.C. § 259(a). It provides that when the merger shall have become effective "all property, rights, privileges, powers and franchises, and all and every other interest" of the constituent corporation "shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations." Property passing from the constituent corporation to the surviving corporations passes by

operation of law. *See Levitt v. Bouvier,* 287 A.2d 671, 673 (Del.1972); *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970); *Heit v. Tenneco, Inc.,* 319 F.Supp. 884, 887 (D.Del.1970).

It is Guardian's contention that Permaglass' 1964 license rights passed to Guardian pursuant to the statutory merger. Its argument continues that property which passes from a constituent corporation to the surviving corporation in a statutory merger passes not by assignment or transfer, but by operation of law. Thus, argues Guardian, the transferability and assignability restrictions contained in the 1964 agreement were not violated.

Neither the parties nor the Court have been able to discover a case that is on all fours with the facts involved in this suit. Guardian, however, has offered a number of cases which it argues, by analogy, support its position.

■ As a general rule, patent licenses are personal to the licensee and non-assignable unless expressly made so in the agreement. *Hapgood v. Hewitt,* 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369 (1886); *Unarco Industries, Inc. v. Kelley Co., Inc.,* 465 F.2d 1303 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973); *Rock-Ola Mfg. Corp. v. Filben Mfg. Co.,* 168 F.2d 919 (8th Cir.), *cert. denied,* 335 U.S. 892, 69 S.Ct. 249, 93 L.Ed. 430 (1948). *See generally* 4 A. Deller, *Walker on Patents* ¶ 409 (2d ed. 1965). *Contra, Farmland Irrigation Co. v. Dopplemaier,* 48 Cal.2d 208, 308 P.2d 732 (1957). Similarly, a shop right, an implied license, is also personal and non-assignable. *Lane & Bodley Co. v. Locke,* 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049 (1893); *Hapgood v. Hewitt,* 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369 (1886). Yet in spite of this restriction it has been held that non-assignable licenses will pass from constituent corporations to a new corporation formed by the consolidation of those corporations. *Lightner v. Boston & A. R. Co.,* 15 F.Cas. 514 (No. 8343) (C.C.D.Mass.1869). And it has also been held that non-assignable shop rights will

1. The Ohio and Delaware statutes applicable to a merger of a foreign and a domestic corporation are more fully set out in the Appendix to this Opinion.

pass from a constituent corporation via merger to the surviving corporation. *Papazian v. American Steel and Wire Company of New Jersey*, 155 F.Supp. 111 (N.D.Ohio 1957); *Neon Signal Devices, Inc. v. Alpha Claude Neon Corp.*, 54 F.2d 793 (W.D.Pa. 1931).[2]

In the major premise of its argument Guardian analogizes the expressly non-transferable and non-assignable license in this case to the non-assignable by implication license and shop rights involved in the cases cited above. Guardian then argues that just as the non-assignability restrictions in the shop rights and licenses referred to above do not prevent their passage to a successor through a merger, so should the express restriction contained in the 1964 license agreement not prevent Guardian from succeeding to Permaglass' rights thereunder.

While persuasive, Guardian's argument can be no stronger than the analogy upon which it is based. Whatever weaknesses exist can be pointed up by reviewing the facts of the cases upon which the defendant relies.

In *Lightner v. Boston & A. R. Co.*, 15 F.Cas. 514 (No. 8343) (C.C.D.Mass.1869), *cited with approval in Lane & Bodley Co. v. Locke*, 150 U.S. 193, 196, 14 S.Ct. 78, 37 L.Ed. 1049 (1893), the court held that a corporation resulting from the consolidation of two corporations succeeded to the license rights of the constituent corporations. A number of factors not present in this case led the court to so conclude. In that case the plaintiff had licensed both of the constituent corporations to use the patents in suit so that the use of the patents was not changed. Additionally, the license contained no express restrictions on transferability. The court did note, however, that ordinarily a license is not transferable thereby recognizing the distinction between

a simple assignment or transfer and succession by merger or consolidation.

Both the *Papazian* and *Neon* cases involved shop rights, a form of license which arises by implication. As a general rule, shop rights are personal and non-assignable but will pass to the surviving corporation in a merger or the resulting corporation in a consolidation. The major difference between the non-assignable features of a shop right and the license involved herein is that the license involved in this case contains an express rather than an implied restriction on transferability.

■ Guardian has also cited a number of cases holding that non-transferable, non-assignable leases will pass to a successor corporation via merger in spite of the restrictions on transferability. *Bangert v. Boise Cascade*, No. 74–211c(4) (E.D.Mo.1975), *aff'd on other grounds*, 527 F.2d 902 (8th Cir. 1976); *Dodier Realty v. St. Louis National Baseball Club*, 361 Mo. 981, 238 S.W.2d 321 (1951); *Segal v. Greater Valley Terminal Corp.*, 83 N.J.Super. 120, 199 A.2d 48 (1964); *Pittsburgh Terminal Coal Corp. v. Potts*, 92 Pa.Super. 1 (1927). These cases so hold on the theory that the surviving corporation in a statutory merger is a successor rather than an assignee, and that the surviving corporation obtains the property of the constituent corporation by operation of law. *Cf. United States v. Seattle–First National Bank*, 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944).

PPG attempts to distinguish these cases by noting that they involved leases rather than personal rights. However, the 1964 license agreement between Permaglass and PPG did not call for the performance of any duties that were of a purely personal nature as that term is understood in cases involving the question of contract assignability. *See generally* 4 A. Corbin, *Contracts* § 865 *et seq.* (1951). The 1964 license agreement

---

**2.** *See Lane & Bodley Co. v. Locke*, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049 (1893), where the court held that a non-assignable shop right would pass to the successor of the entire business of the licensee. The case did not, however, involve a merger or consolidation of two

or more corporations. *See also Gate-Way, Inc. v. Hillgren*, 82 F.Supp. 546 (S.D.Cal.1949), *aff'd*, 181 F.2d 1010 (9th Cir. 1950); *Wilson v. J. G. Wilson Corporation*, 241 F. 494 (E.D.Va. 1917); 66 A.L.R.2d 606 (1959), and the cases cited therein.

was personal only insofar as the parties so designated it.

PPG has cited *Columbus & Southern Ohio Electric Co. v. West*, 140 Ohio St. 200, 42 N.E.2d 906 (1942), in support of its argument that the 1964 license agreement did not survive the merger of Permaglass into Guardian. PPG's reliance on that case, however, is misplaced.

In that case the court was faced with the question of whether a resulting corporation was required to register and pay the license fees on motor vehicles obtained from its constituent corporations where the constituent corporations had already registered the vehicles and paid the license fees for that year. The resulting corporation argued that it succeeded to the licenses by operation of the statutory merger. The court did not agree, ruling strictly on the basis of the registration statute and principles of statutory construction:

> But it would, we hold, be a forced construction to interpret these general provisions [referring to what is now § 1701.82 and the other merger statutes] as controlling the sharp and explicit clauses of Section 6294–1 * * *. Before these explicit statutory provisions of Section 6294–1, the general statutory provisions of Section 8623–68 must give way.

*Columbus & Southern Ohio Electric Co. v. West*, 140 Ohio St.2d 200, 204, 42 N.E.2d 906, 908 (1942).

Guardian does not appear to contend that the applicable merger statutes would override an express prohibition restricting the passage of license rights to a successor corporation through a statutory merger. Indeed it seems clear that the parties to the license agreement could have expressly provided that the rights created thereunder would not pass to a successor corporation through merger and that such a restriction would achieve its purpose. In *Western Air Lines, Inc. v. Allegheny Airlines, Inc.*, 313 A.2d 145 (Del.Ch.1973), the court observed in dicta that:

> even if the Delaware statute obligates the successor corporation in a merger situation to assume the obligations of a predecessor, *contractual obligations would not pass if the parties by their objective contractual language contemplated that such obligations would not pass.*

*Id.* at 152–53 (emphasis added). *See Segal v. Greater Valley Terminal Corp.*, 199 A.2d at 52. Recognizing that PPG had the power to restrict the passage of the license rights via merger, the Court need only determine whether by providing that the license reserved by Permaglass was to be personal, non-transferable and non-assignable, the parties also intended that it would not pass to a successor corporation. The Court finds that they did not so intend.

At the outset it is important to note that both parties to the 1964 license agreement were represented by experienced attorneys and that the agreement was not drafted by laymen. The parties also provided that the agreement was to be "construed in accordance with the laws of the Commonwealth of Pennsylvania." Finally, the parties agreed that the:

> writing constitutes the entire Agreement between the parties hereto and there are no understandings, representations or warranties of any kind with respect thereto other than as expressly set forth herein. § 8.3.

In Pennsylvania, as in other states, the courts distinguish between an assignment of property and an acquisition of corporate property by a successor corporation through merger. *Pittsburgh Terminal Coal Corp. v. Potts*, 92 Pa.Super. 1 (1927). A corporation which acquires the property of its constituent corporations through merger or consolidation is termed a successor corporation and it does not acquire the property by assignment. It acquires the property by operation of law. *Id. See Segal v. Greater Valley Terminal Corp.*, 83 N.J.Super. 120, 199 A.2d 48 (1964); *In re Murray Realty Co.*, 35 F.Supp. 417, 419 (N.D.N.Y.1940).

An interpretation that the restrictions in the 1964 license agreement were not breached by the statutory merger in this case is consistent with the realities of a

corporate merger. Permaglass was never fully divested of its interest in the 1964 license agreement as it would have been had there been an assignment or transfer to a separate corporate entity. Permaglass as a corporate enterprise continues to exist. "A merger ordinarily contemplates the continuance of the enterprise and of the stockholder's investment therein, though in altered form." *Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107, 112 (1952); *Vulcan Materials Company v. United States*, 446 F.2d 690 (5th Cir.), *cert. denied*, 404 U.S. 942, 92 S.Ct. 279, 30 L.Ed.2d 255 (1971).

■ It is this continuity of interest inherent in a statutory merger that distinguishes it from the ordinary assignment or transfer case. Different policy considerations are involved and they justify different treatment. *See generally* 15 W. Fletcher, *Cyclopedia of Corporations* § 7086 *et seq.* (Perm. ed. 1973). On this point the court in *Segal v. Greater Valley Terminal Corp., supra*, observed:

> One who deals with a corporation must realize that the beneficial ownership of that corporation can be changed at any time. Merger is only one of the ways in which that change may be made. To deny the benefit of a merging corporation's nonassignable contracts to the surviving corporation in a merger authorized by statute would sharply limit the utility of such statutes.

199 A.2d at 51.

■ Because the parties failed to provide that Permaglass' rights under the 1964 license agreement would not pass to the corporation surviving a merger, the Court finds that Guardian succeeded to Permaglass' license pursuant to 8 Del.C. § 259, and Ohio Revised Code §§ 1701.81 and 1701.83.

■ What the Court has said above applies to both the nine reserved Permaglass patents and to the two PPG patents in suit. As to the two PPG patents the Court must now consider whether the merger operated as a termination under § 11.2 of the 1964 license agreement.

That section, applicable only to two of the patents in suit, provides:

> 11.2 In the event that a majority of the voting stock of PERMAGLASS shall at any time become owned or controlled directly or indirectly by a manufacturer of automobiles or a manufacturer or fabricator of glass other than the present owners, the license granted to PERMAGLASS under Subsection 4.1 shall terminate forthwith.

PPG argues that pursuant to the merger all of the voting stock of Permaglass became "owned or controlled" by Guardian, a "manufacturer or fabricator of glass." That Guardian is a "manufacturer or fabricator of glass" is clear. Tr. 70–73. The Court must decide only whether pursuant to the statutory merger Guardian became the owner or controller of a majority of the voting shares of Permaglass.

Guardian asserts that the merger was really a corporate reorganization and not a stock acquisition in violation of the termination clause. The Court agrees.

Pursuant to the terms of the merger agreement ¶ 9, each share of Permaglass was converted into a prorata share of Guardian stock. After the Permaglass shareholders received the Guardian shares in exchange, the Permaglass shares ceased to represent ownership in either Permaglass or its successor Guardian. The Permaglass shareholders' investment in Permaglass, however, continued, although in altered form. *Sterling v. Mayflower Hotel Corp., supra*. Thus, the voting stock of Permaglass did not, in a real sense, become owned or controlled by Guardian. This result follows from the nature of a statutory merger in contrast to an outright sale or acquisition of stock.

Accordingly, the Court finds that Guardian is licensed to use the patents in suit, and that this action should be dismissed on the merits.

### II.

■ Guardian also argues that under the February 24, 1969 "Exclusive License

Agreement" it is licensed to use the four furnace units which are alleged to infringe the eleven patents in suit; viz, the Millbury No. 1 and No. 2 units, the Torrance furnace unit and the Carleton furnace unit. This license expressly provided that it was not "assignable by PERMAGLASS, except to a successor of its entire business." It is thus clear that Guardian succeeded to whatever rights Permaglass had under this agreement, and that the only question to be decided is whether the agreement granted Permaglass a license to use the four furnace units described above. Before examining the terms of the agreement itself, it would be helpful to review, briefly, the facts which led to its execution.

The inventions connected with the 1964 agreement discussed *supra* involved the gas hearth process. That process was effective only for the manufacture of flat or cylindrical-shaped pieces of glass. Permaglass, however, was faced with a demand for making larger pieces of glass of irregular shape. In fact, one of Permaglass' "customers wanted a back lite [automobile rear window] which had a W–shape, horizontal cross section." Tr. 156–157. At that time Permaglass was not aware of any way that such a piece could be manufactured and so it "launched a development project which resulted in the construction of the Millbury No. 2 line." *Id.*

The Millbury No. 2 line used a gas hearth system to heat the flat glass pieces. However, it also incorporated a mechanical air forming tool which was used to form the irregularly-shaped pieces of glass referred to above.

PPG subsequently learned of this new development and negotiations with Permaglass resulted in the 1969 agreement hereunder discussed.

 That agreement is an integrated contract, § 8.3, and the Court will not consider any evidence of antecedent understandings and negotiations introduced for the purpose of varying or contradicting the express written provisions of the agreement.

In § 4.8 of the agreement, PPG granted Permaglass:

a royalty-free, non-exclusive license under the PERMAGLASS Licensed Patents and the PERMAGLASS Technical Data authorizing PERMAGLASS to construct for its own use and to use Licensed Furnace Units.

It is thus immediately apparent that Guardian's characterization of the agreement as a license to use Licensed Furnace Units is misleading. It is a license "under Permaglass Licensed Patents and Permaglass Technical Data" to use Licensed Furnace Units.

In § 1 of the agreement the terms used in the § 4.8 license were carefully defined as follows:

1.1 "Gas Hearth Systems" shall mean any method, machine, manufacture or composition of matter covered by any claim or claims of any of the PPG patents and/or PERMAGLASS patents included in the Agreement between PPG and PERMAGLASS dated January 1, 1964, or included in any of the "PERMAGLASS Technical Data" as defined in Section 1.5 of said January 1, 1964 Agreement.

1.5 "Millbury No. 2 Unit" means the horizontal bending and tempering unit which has been constructed by PERMAGLASS at its Millbury, Ohio facility and which incorporates a Gas Hearth System and also the features covered by the United States patent applications listed in Schedule A hereof.

1.6 "PERMAGLASS Licensed Patents" means the United States patent applications listed in Schedule A hereof, any patents issuing on said applications or on any divisions or continuations thereof, any reissues of any of said patents, any and all foreign patent applications and patents corresponding to any of said United States patent applications or patents, and any and all other patent applications and patents, United States or foreign, which are now or hereafter owned by PERMAGLASS and which cover any feature or features of, or any method practiced by the use of the Millbury No. 2

Unit or any unit of the same or substantially similar design which is constructed by or under technical supervision of PERMAGLASS for PPG prior to December 31, 1969.

1.7 "PERMAGLASS Technical Data" means any and all inventions, trade secrets, engineering data, drawings, designs and technical know-how relating to the construction and/or operation of the Millbury No. 2 Unit or any unit of the same or substantially similar design which is constructed by or under the technical supervision of PERMAGLASS for PPG prior to December 31, 1969, such information including, without limitation, all information desirable or necessary for duplication of the design, procurement, installation and operation of said unit or units.

1.8 "Licensed Furnace Units" means Gas Hearth Systems which embody, or are for the practice of, the inventions covered by the PERMAGLASS Licensed Patents and/or the PERMAGLASS Technical Data.

■ By condensing the essential elements from these definitions it can be seen that to qualify as a "Licensed Furnace Unit", the four furnace units alleged to infringe the eleven patents in suit must satisfy the following requirements:

1) They must incorporate "Gas Hearth Systems", § 1.1, _and_ either 2 or 3 below;

2) They must embody or practice the patent applications listed in Schedule A _and_ any and all other patents and patent applications owned by Permaglass [as of the date of the 1969 agreement] which cover any feature of the Millbury No. 2 Unit, § 1.5, _supra._ § 1.6.

3) They must embody or practice the technical data relating to the Millbury No. 2 Unit, § 1.5, _supra._ § 1.7.

As the parties concede that the four furnace units embody "Gas Hearth Systems", they need only satisfy the requirements of ¶¶ 2 or 3 above.

Guardian concedes that neither the Millbury No. 1 nor the Carleton Furnace Units practice any of the Schedule A patents.

See Defendant's Brief in Support of its License Defense at 7, 9, and 1969 License Chart. Thus, to qualify as a Licensed Furnace Unit those two units must embody the Permaglass Technical Data as that term is defined in § 1.7. That section, however, refers to various types of data which relate to the construction and/or operation of the Millbury No. 2 Unit.

The Millbury No. 2 Unit, in turn, is defined as the "horizontal bending and tempering unit which has been constructed by PERMAGLASS at its Millbury, Ohio facility and which incorporates a Gas Hearth System _and also the features covered by the United States patent applications listed in Schedule A hereof._" § 1.5 (emphasis added). Because neither the Millbury No. 1 nor the Carleton Units embody or practice the Schedule A patents, they fail to qualify as Licensed Furnace Units.

The major flaw in Guardian's argument can be observed by examining the chart found on page 5 of its Brief in Support of its License Defense. Guardian asserts that "any furnace which satisfies Paragraph (1) plus any one of either Paragraph 2(a) _or_ 2(b) _or_ (3) is a 'Licensed Furnace Unit' according to the 1969 Furnace License." Paragraphs 2(a) and 2(b) have been distilled from § 1.6 of the agreement.

The flaw in Guardian's argument is in its construction of § 1.6. That section defines Permaglass Licensed Patents as the patent applications listed in Schedule A _AND_ (not _or_) any claim of any other Permaglass-owned patent covering any feature of the Millbury No. 2 Unit.

The Torrance Furnace Unit embodies a Gas Hearth System and one of the Schedule A patents. However, that furnace unit cannot qualify as a Licensed Furnace Unit by simply practicing one Schedule A patent. Both the definition of "Permaglass Licensed Patents" and "Permaglass Technical Data" (which require compliance with the definition of "Millbury No. 2 Unit") require the embodiment or practice of the "patent applications listed in Schedule A."

The Millbury No. 2 line is the unit on which the Schedule A patents and technical

data were first practiced. Were those patents and technical data still embodied in Millbury No. 2 Unit it would, by definition, be a "Licensed Furnace Unit" immune from PPG's patent infringement action. However, subsequent to the execution of the 1969 agreement, the horizontal bending and tempering unit incorporating the features covered by the Schedule A patents was dismantled and the unit was operated without this feature for a period of years. Tr. 72–73. During this period, the Millbury No. 2 Unit did not qualify as a "Licensed Furnace Unit."

The Court's interpretation of the 1969 agreement as not conferring a license to use the four furnace units discussed *supra* is bolstered by the absence of any indication that the parties intended to modify the license rights created in the 1964 agreement. The 1969 agreement itself provided in the preamble that PPG was desirous of obtaining all of Permaglass' rights in its "new and improved horizontal glass bending and tempering gas hearth system." The agreement said nothing about modifying the rights created in the 1964 agreement. Moreover, the parties who negotiated and signed the agreement testified that the 1969 agreement was not intended to modify the 1964 agreement. Tr. 158–59, 190–91. The Court, therefore, finds that the four furnace units alleged to infringe the patents in suit are not "Licensed Furnace Units" within the meaning of the 1969 agreement.

As noted above, Guardian has based its argument that it is licensed to use the eleven patents in suit on the two agreements discussed above. Each argument is independent of the other, and the Court's conclusion that Guardian is not licensed under the 1969 agreement does not affect the Court's determination that Guardian is licensed to use the patents in suit under the 1964 agreement.

For the foregoing reasons, it is accordingly

ORDERED that the action be dismissed on the merits, and that the Defendant Guardian recover of the Plaintiff PPG its costs of action.

## APPENDIX

8 Del. C. § 252. *Merger or consolidation of domestic and foreign corporations; service of process upon surviving or resulting corporation.*

(a) Any 1 or more corporations of this State may merge or consolidate with 1 or more other corporations of any other state or states of the United States, or of the District of Columbia if the laws of the other state or states, or of the District permit a corporation of such jurisdiction to merge or consolidate with a corporation of another jurisdiction. The constituent corporations may merge into a single corporation, which may be any 1 of the constituent corporations, or they may consolidate into a new corporation formed by the consolidation, which may be a corporation of the state of incorporation of any 1 of the constituent corporations, pursuant to an agreement of merger or consolidation, as the case may be, complying and approved in accordance with this section. In addition, any 1 or more corporations organized under the laws of any jurisdiction other than 1 of the United States may merge or consolidate with 1 or more corporations existing under the laws of this State, if the surviving or resulting corporation will be a corporation of this State, and if the laws under which the other corporation or corporations are formed permit a corporation of such jurisdiction to merge or consolidate with a corporation of another jurisdiction.

\* \* \* \* \* \*

8 Del. C. § 259. *Status, rights, liabilities, of constituent and surviving or resulting corporations following merger or consolidation.*

(a) When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case

may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations, and the title to any real estate vested by deed or otherwise, under the laws of this State, in any of such constituent corporations, shall not revert or be in any way impaired by reason of this chapter; but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

Ohio Revised Code § 1701.81 *Effect of merger.*

(A) When such merger or consolidation becomes effective:

(1) The separate existence of all the constituent corporations, except the surviving or new corporation, shall cease, except that, whenever a conveyance, assignment, transfer, deed, or other instrument, or act, is necessary to vest property or rights in the surviving or new corporation, the officers of the respective constituent corporations shall execute, acknowledge, and deliver such instruments, and do such acts, and for such purposes the existence of the constituent corporations and the authority of their respective officers and directors shall be deemed continued notwithstanding the merger or consolidation;

(2) The constituent corporations shall become a single corporation which, in the case of a merger, shall be that one of the constituent corporations designated in the agreement of merger as the surviving corporation and, in the case of a consolidation, shall be the new corporation provided for in the agreement of consolidation;

(3) The surviving or new corporation shall have all the rights, privileges, immunities, powers, franchises, and authority and shall be subject to all the obligations of a corporation formed under sections 1701.01 to 1701.98, inclusive, of the Revised Code;

(4) The surviving or new corporation shall thereupon and thereafter possess all the rights, privileges, immunities, powers, franchises, and authority, as well of a public as of a private nature, of each of the constituent corporations; and all property of every description, and every interest therein, and all obligations, including subscriptions to shares, of or belonging to or due to each of the constituent corporations, shall thereafter be taken and deemed to be transferred to and vested in the surviving or new corporation without further act or deed; and title to any real estate, or any interest therein, vested in any of the constituent corporations shall not revert or in any way be impaired by reason of such merger or consolidation;

(5) To the extent permitted by the laws of any other state in which any constituent corporation has property, the provisions of paragraph (4) of division (A) of this section apply in such state;

(6) The surviving or new corporation shall thenceforth be liable for all the obligations of each of the constituent corporations, including liability to dissenting shareholders; and any claim existing or action or proceeding pending by or against any of the constituent corporations may be prosecuted

to judgment, with right of appeal as in other cases, as if such merger or consolidation had not taken place, or the surviving or new corporation may be substituted in its place;

(7) All the rights of creditors of each constituent corporation shall be preserved unimpaired, and all liens upon the property of any of the constituent corporations shall be preserved unimpaired, limited in lien to the property affected by such liens immediately prior to the effective date of the merger or consolidation;

\*　　\*　　\*　　\*　　\*　　\*

Ohio Revised Code § 1701.82 *Merger with foreign corporation.*

One or more domestic corporations may merge or consolidate with one or more foreign corporations in the following manner, if such merger or consolidation is permitted by the laws of each state under the laws of which any constituent foreign corporation exists:

\*　　\*　　\*　　\*　　\*　　\*

Ohio Revised Code § 1701.83 *Effect of merger with foreign corporation.*

(A) Upon the filing of the agreement of merger or consolidation in compliance with the laws of each state under the laws of which any constituent corporation exists, or at such later date as the agreement specifies, the merger or consolidation shall become effective.

(B) The effect of such merger or consolidation, if the surviving or new corporation is to be a domestic corporation, shall be the same as in the case of the merger or consolidation of domestic corporations. If the surviving or new corporation is to be a foreign corporation:

(1) The surviving or new corporation shall thenceforth be liable for all the obligations of each of the constituent corporations, including liability to dissenting shareholders;

(2) All the rights of creditors of each constituent corporation shall be preserved unimpaired, and all liens upon the property of any of the constituent corporations shall

be preserved unimpaired, limited in lien to the property affected by such liens immediately prior to the effective date of the merger or consolidation;

(3) The effect of such merger or consolidation shall, in all other respects, be the same as in the case of the merger or consolidation of domestic corporations except in so far as the laws of such other state otherwise provide.